UNITED STATES of America ex rel.
Odell HEATH

*v.*

Alfred T. RUNDLE, Superintendent.
Misc. No. 4007.

United States District Court
E. D. Pennsylvania.

May 9, 1969.

Robert H. Finkel, Philadelphia, Pa., Court-appointed for relator.

Arlen Specter, Dist. Atty., Samuel T. Swansen, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION

JOSEPH S. LORD, III, District Judge.

Odell Heath pled guilty on December 10, 1951, before Judge James Gay Gordon, now deceased, in the Philadelphia Court of Quarter Sessions to six bills of indictment, November Sessions, 1951, Nos. 1048–53, charging burglary, larceny and receiving stolen goods, and one bill of indictment No. 1054 charging possession of burglary tools. He was represented by appointed counsel. Relator was sentenced to serve consecutive terms totalling 25 months to 50 years, with sentence suspended on bills 1052 and 1053. Relator did not appeal. He has, however, exhausted state post-conviction remedies.

From these sentences relator was paroled on February 7, 1956. He is presently serving a sentence of 3 to 10 years for burglary imposed on June 19, 1963, having been "constructively paroled" from serving the remainder of his 1951 sentence on February 9, 1967.

Relator here attacks his 1951 conviction. At the outset we are faced with the question whether relator is "in custody" within the meaning of 28 U.S.C.A. § 2241(c) (Supp.1968) where the only "restraint" arising from that conviction is the service of parole at the expiration of his present, unattacked sentence. At the present time, relator is subject to the parole board's jurisdiction until the year 2004.

In Jones v. Cunningham, 371 U.S. 236, at page 243, 83 S.Ct. 373, at p. 377, 9 L.Ed.2d 285 (1963), the Court said:

"* * * [Habeas corpus] is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right·to be free from wrongful restraints upon their liberty. While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board within the meaning of the federal habeas corpus statute; * * *"

It makes little difference that we do not know the exact nature of the restraints and conditions to which relator will be subject when he begins service of parole on the 1951 sentence. Under the Pennsylvania statute it is clear that while serving parole relator is subject to the power of the parole board, 61 P.S. § 331.17 (1964), and that this board has "exclusive power to parole and reparole, commit and recommit for violations of parole." Id. It is also clear that relator can be recommitted to prison to serve the remainder of his 1951 sentence for a "technical violation" of his parole. 61 P.S. § 331.21a(b) (1964). These provisions alone constitute restraint sufficient to invoke federal habeas corpus jurisdiction under § 2241(c) (Supp.1968). Jones v. Cunningham, 371 U.S. 236, 242, n. 19, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963);

*accord*, Benson v. California, 328 F.2d 159, 162 (C.A.9, 1964).

Nor are we precluded from deciding relator's contentions because they are "premature" now that McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934), has been overruled. Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L. Ed.2d 426 (1968), decided that federal habeas corpus jurisdiction was not defeated even though the petitioner was not entitled to his "immediate release" where he challenged the conviction supporting a consecutive sentence commencing at a future date and not the conviction for which he was currently incarcerated. The Court held that under these circumstances federal district courts were empowered "to fashion appropriate relief other than immediate release." *Id.* at 66, 88 S.Ct. at 1556. We turn to the merits.

Relator attacks his plea of guilty to bills of indictment No. 1048 and Nos. 1050-52 (conceding the voluntariness of his plea to the Teague burglary, No. 1049) on the ground that a coerced confession played a major role in inducing the guilty pleas which for that reason were rendered involuntary. We ordered a hearing.

At the hearing, relator was the only witness to testify. Neither the attorney who interviewed relator in Holmesburg prison before his plea, nor counsel who represented relator at the hearing on the plea testified because neither had any recollection of these incidents. The Commonwealth presented no evidence.

Relator is a fifty-year-old man who completed six grades in Philadelphia's public schools and left school in the seventh grade at the age of sixteen. Relator was interviewed in Holmesburg prison on November 11, 1951 by the Voluntary Defender's office while awaiting arraignment. This interviewer wrote two pertinent observations on his interview sheet: "Mentality dull" and "stammers badly." Relator's limited education, his tendency to stammer, and a limited mental capacity were evident at our hearing. During his testimony before us, relator was timid; his answers sometimes wandered, although they were simple and direct when his attention was focused.[1] Upon a review of the state record we find that his contentions are supported in important respects, and our observation of him leads us to believe the material aspects of his testimony:

On November 10, 1951, at approximately 1:00 a. m. relator was caught in the act of stealing several suits of clothes from a Mr. Teague's tailor and dry cleaning shop, which relator had just burglarized. He was held by Mr. Teague until two police arrived. One of the police grabbed relator, called him a dirty thief and punched him in the head. Relator was taken to the police station at 11th and Winter Streets, booked, and taken into a side room by Detectives Brantley and Wentz. One of them thrust before relator some papers describing unsolved burglaries and told him to pick out those "jobs" he had committed. Relator denied any knowledge of the burglaries, whereupon Detective Brantley "hit me in my side and knocked me out of the chair on the floor and I passed out * * *."[2] Relator awakened at Hahnemann Hospital about 2 o'clock in the afternoon, ten or eleven hours later. About 3 o'clock that same afternoon relator was returned to 11th and Winter Streets by the same two detectives, taken

1. The relator's difficulty in communicating at our hearing was almost constant, resulting from his stammer and a rapid mumbling of his words. See Federal Notes of Testimony in United States District Court, pp. 17, 20-21, 24, 34, 48 [hereinafter cited as Fed.N.T.]. The Commonwealth's habeas corpus hearing produced the same problem. Notes of Testimony in Philadelphia Court of Quarter Sessions, 1967, p. 14 [hereinafter cited as State N.T.]. At relator's 1951 hearing on the plea, the same difficulty was encountered. N.T. pp. 12, 14 [hereinafter cited as 1951 Hearing N.T.].

2. Fed.N.T. p. 12.

back to the same room, and in relator's words:

"They set me down in the chair and started taking off their coat and rolling up their sleeves and he said, 'Now I am going to read some of these here crimes off to you and the ones that you did, I want you to tell me that you committed them.'

"And I told them, I said, 'Mister, I don't know nothing about them crimes you are talking about.'

"And I said—and Brantley, he was standing behind me again and the next thing I know there was some slaps over my head. I don't know if it was a rubber hose or what and I said, 'Look, can't I call my brother, or something?'

"And he said, 'Yes, you can make a phone call when we get through with you.' " [3]

Shortly thereafter relator, with Detective Brantley's assistance, confessed to some burglaries. At no time was relator warned of his right to counsel or his right to remain silent, a fact which does not *per se* vitiate the confession, but which gives added weight to the other circumstances present. Davis v. State of North Carolina, 384 U.S. 737, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

There can be no serious dispute that relator was beaten by the police and hospitalized, and the Commonwealth does not seriously contend otherwise. In addition to relator's testimony, which we believe, there is corroborating evidence. His Holmesburg interviewer noted that relator complained of a beating in the police station at 11th and Winter Streets administered by Detective Brantley with fists and rubber hose. Relator still complained of bruised ribs and affirmed that his beating was, to quote the interview sheet, "convincing."

Further, at relator's arraignment and after his guilty plea had been entered,

the Commonwealth presented some evidence on the bills to which relator had pleaded, including testimony by Detective Robert Wentz. After reciting that relator was apprehended and taken to the police station, and questioned by Detective Brantley and himself, the following exchange took place:

"Q. [By the District Attorney] What did he [relator] say, if anything, with respect to this situation?

"A. [Detective Wentz] At the time he was questioned Mr. Teague wasn't present. When he [relator] was brought into the district he was in an unconscious condition. He was taken to the—

BY THE COURT:

"Q. After he came around and you had a chance to question him, all we want to know is what he told you." [4]

While Detective Wentz could hardly be expected to relate any police brutality, there are interstices through which the gravity of truth must seep. We find that relator was beaten. The more important question is whether relator's beating coerced his confession to the additional burglaries.

It is clear that relator was questioned closely on the heels of his overnight hospitalization, a fact the Commonwealth does not dispute. Relator testified that he admitted the additional burglaries because he was "tired of being slapped on the side of the head" and he was "still" a "little dizzy" after his hospitalization: [5]

"BY MR. FINKEL:

"Q. What did you think would happen if you didn't pick out some of those pages?

"A. He [Detective Brantley] kept on talking about he is going to spill my brains in the middle of the floor and all this stuff." [6]

The police interrogators also seem to have used a rather crude carrot-and-stick

---

3. Fed.N.T. p. 14. Relator's version of events at his state hearing is identical. State N.T. pp. 7–9.

4. 1951 Hearing N.T. p. 10.

5. Fed.N.T. p. 58.

6. Fed.N.T. pp. 58–59.

technique as well, comprising more stick than carrot. Relator testified that Detective Brantley said he would get "a lot of time" on the Teague burglary if he did not admit to all the burglaries. If Brantley's statement is viewed in its most charitable light,—a promise of leniency,—it was the not infrequent shoddy tactic of holding out something beyond the power of the interrogator to insure. And 50 years imprisonment, imposed after Heath acceded to Brantley, is in our view "a lot of time." Viewed in its more sinister aspect, Brantley's words could be taken as a psychological threat coming from the same man who had already put relator in the hospital. In the shaken condition relator must have been, "cooperation" was surely the indicated order of the day. Relator had been caught burglarizing Mr. Teague's tailor shop and Detective Brantley was evidently determined to throw additional burglaries at him. Admitting to them avoided further "convincing" and held out hope of some kind of "break"—relator thought perhaps a sentence of from three to ten years.[7]

■■■ In determining the voluntary nature of a confession, we must consider the cumulative impact upon relator of the totality of the surrounding circumstances. Clewis v. Texas, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). Regarding the facts in this light, we find that a preponderance of the evidence establishes that relator's oral confession was coerced.

■ The crucial question then becomes whether relator's coerced confession "played a substantial role in bringing about or inducing the subsequent plea of guilty." United States v. Morin, 265 F.2d 241 (C.A.3, 1959); United States ex rel. Stamm v. Rundle, 270 F. Supp. 819, 821 (E.D.Pa., 1967). If the "pleas of guilty were indeed induced by a coerced confession and thus were deprived of their character as voluntary acts they are void." United States ex rel. McCloud v. Rundle, 402 F.2d 853 (C.A.3, 1968).

The record in this case is barren of any evidence that the prosecution, the court or relator's appointed counsel took any protective steps to insure that relator clearly understood the consequences of his plea or that it was in fact voluntary. Where the state record lacks an affirmative showing of the protective steps required to ascertain the voluntary nature of the pleas "the Commonwealth had the burden of proving that appellant's pleas were voluntary." United States ex rel. McCloud v. Rundle, supra, at 858.

At the outset we notice that no voir dire was conducted by the hearing judge before the entry of the plea. Further, when Detective Wentz testified after the plea that relator was unconscious before the questioning that led to his confession, the judge not only ignored that fact but swept it aside by himself asking directly about relator's confession.

The Commonwealth argues that from relator's representation by counsel we can presume the understanding and voluntary nature of his guilty plea. Aside from the fact that here the Commonwealth has the burden of proof, United States ex rel. McCloud v. Rundle, supra, we refuse to draw that inference. Relator met his counsel for the first time in the courtroom immediately before the hearing. The only fragment of counsel's conversation with relator which relator remembers—"I see here where you are pleading guilty to these here burglaries"[8]—indicates that counsel had before him the Holmesburg interview sheet. Relator maintains that counsel did not say much more than that to him about his case. Relator also says he told counsel he was pleading guilty because the detectives had said he would get a lot of time if he didn't; counsel did not advise him one way or the other and did not question relator further, or inquire about the beating.

---

7. Fed.N.T. p. 62.

8. Fed.N.T. p. 22. Relator repeated these words at pp. 24 and 59.

During the hearing which followed relator's plea,[9] relator's counsel asked no questions on cross-examination (or otherwise), and inexplicably himself offered in evidence the "burglar's tools" recovered by the police from relator's apartment. Before sentencing, counsel did not question relator about family or job or make any arguments in mitigation of sentence. These facts indicate that relator's representation was *pro forma* at best. They refute the Commonwealth's argument that the plea should be found voluntary solely because relator had counsel and fall short of supporting the Commonwealth's burden of showing a voluntary and understanding plea.

The Commonwealth attacks the credibility of relator's version of events by pointing out that the Holmesburg interview sheet indicates that relator discussed with the interviewer the possibility of pleading guilty to four of five burglary charges.[10] This notation, it argues, demonstrates that the relator was not coerced into pleading guilty, but rather chose to do so.

The answer to that argument is that relator apparently accepted his confession as a fact of life. When questioned about his conversation with the Holmesburg interviewer, the following colloquy transpired:

"BY MR. FINKEL:

"Q. What did the interviewer say at Holmesburg about this? [The confession and threat of a lot of time].

Did he have any discussion with you aside from writing things down on the form?

"A. No, he didn't say no more than that.

"Q. Did he say anything to you about pleading guilty?

"A. No, sir.

"Q. Did you say anything to him about pleading guilty?

"A. Yes, sir. I told him that they had beat me and—

THE COURT: I don't understand you.

MR. FINKEL: A little slower, Mr. Heath, and a little louder.

THE COURT: Take your time. * * * If I can't hear half of it you will only be making half of it so it is better that you should take your time, relax, and speak up.

THE WITNESS: Yes, Sir. I told him that being as this here detective had put these here papers before me *and that I had done admitted to them* that I think it was best for me to go ahead and plead guilty because he [Detective Brantley] said if I don't he is going to see I get a lot of time." [11] (Emphasis added).

We are convinced that petitioner was coerced into pleading guilty by the totality of the circumstances surrounding him: his acknowledged guilt of one burglary, a coerced, but to his knowledge, valid confession of guilt to five others,

9. At this hearing, five victims of the burglaries charged against relator verified that articles had been stolen from their apartments. Only Mr. Teague could identify relator. At our hearing, relator denied knowing any of the witnesses except Mr. Teague and Detective Wentz.

Detective Wentz testified to relator's oral confession and tied relator to indictment No. 1048 by relating the alleged implication of relator by "Charley Brown", a man already in custody and charged with the burglary in No. 1048. All of this testimony was taken after relator had pled guilty to all charges.

10. The interview sheet indicates that relator freely admitted to the interviewer

his guilt in the Teague burglary and indicated that he intended to plead guilty to four of five other "burglary charges against me. * * * I do not remember the dates." Relator maintains, as he did in the state habeas hearing, that he did not know he was being interviewed by a lawyer with respect to the burglaries: he thought his questioning related to "this here girl that I was supposed to be going with at that time. She was pregnant at the time, and asked me about my family, and all that stuff." State N.T. p. 10. See Fed.N.T. p. 60.

11. Fed.N.Y. pp. 19–20.

and the threat of "a lot of time"—hardly empty coming from Brantley and in view of relator's criminal record—if he didn't plead guilty.

In this situation, with relator's limited education and intelligence, his timidity, and his obvious difficulty in communicating,[12] we find particularly apt Mr. Justice Frankfurter's definition of the requisite voluntariness of a guilty plea:

> "There must be both the capacity to make an understanding choice and an absence of subverting factors so that the choice is clearly free and responsible. If the choice is beclouded, whether by duress or by misleading advice * * * a plea of guilty accepted without more than what this record discloses can hardly be called a refusal to put the inner feeling of innocence to the fair test of the law with intelligent awareness of consequences." Von Moltke v. Gillies, 332 U.S. 708, 729, 68 S.Ct. 316, 326, 92 L.Ed. 309 (1948).

■ We conclude that relator's decision to plead guilty to Nos. 1048, 1050, 1051 and 1052 was not voluntary. *Cf.* Thurmond v. Mancusi, 275 F.Supp. 508, 516–517 (E.D.N.Y., 1967).

We are deeply indebted to Robert H. Finkel, Esquire, for his able and dedicated representation of relator, a burden he assumed willingly and without compensation.

### ORDER

And now, this 9th day of May 1969, it is ordered that the petition for writ of habeas corpus be and it hereby is granted as to Bills of Indictment Nos. 1048, 1050, 1051 and 1052, November Sessions, 1951, Court of Quarter Sessions of Philadelphia County. The execution of the writ will be stayed for a period of sixty (60) days to afford the Commonwealth an opportunity to appeal or to re-try the relator. In the event that the Commonwealth appeals, any further stay of this Order beyond sixty (60) days from the date hereof shall be sought only in the Court of Appeals. Absent an appeal and further stay within sixty (60) days, or a re-trial of petitioner within sixty (60) days, at the expiration of said period, relator shall be released from custody on said Bills of Indictment Nos. 1048, 1050, 1051 and 1052.

---

12. See note 1, *supra.* Relator's inability to communicate with counsel and the court is, when coupled with the inadequate state record of safeguards to ensure a voluntary plea, as relevant here as it is where ineffective assistance of counsel is at issue. See Martin v. Commonwealth of Virginia, 365 F.2d 549, 553 (C.A. 4, 1966); United States ex rel. Bradford v. Rundle, 296 F.Supp. 1064 (E.D.Pa. February 25, 1969) (free communication between counsel and client is "essential").