**UNITED STATES of America ex rel.
Edwin W. GOCKLEY**

v.

**David N. MYERS, Superintendent, State
Correctional Institution.**

**Misc. No. 2790.**

United States District Court,
E. D. Pennsylvania.

July 10, 1970.

H. Robert Fiebach, Philadelphia, Pa., for relator.

Arthur Ed. Saylor, Reading, Pa., for respondent.

## OPINION

LUONGO, District Judge.

Edwin W. Gockley is serving a 10-20 year sentence imposed by the Court of Oyer and Terminer of Berks County (No. 167, March Sessions, 1961) after conviction for the murder in the second degree of one Clement J. Smith. In this petition for writ of habeas corpus, Gockley charges that his constitutional rights were violated in that confessions used at his trial were involuntary and were the fruit of an illegal arrest. Hearings were held in this court on August 14, 1967, December 29, 1969 and March 2, 1970.[1] The nature of the claims presented requires an extensive review of the facts established by the hearings in this court and from the state court records.

In March 1960, Mabel Klein, a resident of the City of Reading, Pennsylvania, mysteriously disappeared. During the course of the police investigation into her disappearance, the officer in charge, Captain John H. Feltman, received reports that Gockley had been seen on the

---

1. The state conviction was affirmed by the Pennsylvania Supreme Court. Commonwealth v. Gockley, 411 Pa. 437, 192 A.2d 693 (1963). Gockley then filed a petition for writ of habeas corpus in this court which I denied without hearing. The Court of Appeals affirmed in part and reversed in part, remanding the case for a hearing on two issues: (1) whether relator had waived his right to challenge the introduction of certain written and oral statements at trial and, if he had not, (2) whether the statements were voluntary. United States ex rel. Gockley v. Myers, 378 F.2d 398 (3d Cir. 1967). In response to this mandate a hearing was held on August 14, 1967. I concluded that relator had not waived his right to challenge the admission of the statements but that the issue of voluntariness should be returned to the state courts for initial resolution. United States ex rel. Gockley v. Myers, 276 F.Supp. 748 (E.D.Pa.1967). That order was likewise appealed and reversed, the Court of Appeals ruling that because of the peculiar circumstances of this case (primarily the long delay) state procedures should be bypassed and determination be made by this court of the voluntariness of the statements. United States ex rel. Gockley v. Myers, 411 F.2d 216 (3d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96 (1969). Accordingly, the hearings on December 29, 1969 and March 2, 1970 were held.

Klein premises, apparently engaged in work of some sort. Accordingly, on July 13, 1960, Gockley was asked to come to Reading City Hall to talk with Captain Feltman. Gockley readily agreed. At this time the police were not aware that a crime had been committed, and Feltman sought only to inquire if Gockley knew of Mabel Klein's whereabouts. Gockley told Feltman that Mabel Klein had entered into a contract with him to make repairs to her premises and had given him a power of attorney. He stated that thereafter Mabel had run off to Georgia and married an Arthur Smith, and that she telephoned Gockley every Friday. Feltman asked Gockley to notify him when Mabel called again and requested that he bring to City Hall the contract for repairs and the power of attorney. Following that conversation, Feltman investigated the information given by Gockley as to Mabel Klein's whereabouts, but the efforts bore no fruit.

Feltman met with Gockley for the second time in September 1960. This meeting was by Feltman's request after Gockley had again been observed on Mabel Klein's premises. At this meeting, Gockley informed Feltman that Mabel Klein had failed to telephone him for some time, and that as a result he had stopped work on the repairs at her home. He again promised to produce the power of attorney and the contract for repairs.

More than a month later, on October 20, 1960, while Feltman was questioning one Ethel Briggs at her home concerning Mabel Klein's disappearance, Gockley appeared. After some discussion, Gockley called Feltman outside, gave him the keys to Mabel Klein's home, and told him that if he wanted further information about Mabel Klein to contact one Clement Smith. Within a few days

the police discovered that Smith, too, had disappeared sometime in March 1960. They also learned that a few days after Smith's disappearance, Gockley had attempted to take Smith's belongings from his apartment but Smith's landlady had refused to permit him to do so without authorization. Shortly thereafter the landlady received a postcard from Baltimore, Maryland, purportedly written and signed by Smith, authorizing Gockley to take charge of Smith's possessions. A few days later Gockley returned, paid Smith's back rent and took Smith's property.

On October 31, 1960, Captain Feltman, accompanied by his assistant, Policewoman Betty Jane Wenger, and by Detective Elwood Krause of the State Police, drove to Gockley's residence to inquire about the power of attorney and the repair contract. Gockley wasn't there, but they did encounter him on their way back to Reading. He agreed to return to his home to get the documents. When he arrived there, Gockley left the police for approximately five minutes and returned with two papers, a power of attorney and a contract for repairs, purportedly signed by Mabel Klein. On November 14, 1960, Feltman sent on to the FBI in Washington for handwriting analysis [2] the papers obtained from Gockley and the aforementioned postcard received by Smith's landlady.

On November 16, a warrant was issued for Gockley's arrest on a charge of forging Mabel Klein's signature on a check. Gockley was arrested at about 6:00 p. m. on November 17. He was questioned that evening on the forgery charges. On the following day, after a search of his premises,[3] he was questioned for approximately three and a half hours concerning the forgery and about certain articles found during the search. On the morning of November

---

2. The FBI tests indicated that the signatures were forged. The record shows that the documents were returned on December 22, 1960, but there is nothing to indicate when Feltman was apprised of the results of the tests.

3. The search has been earlier upheld as consensual. United States ex rel. Gockley v. Myers, 378 F.2d 398 (3d Cir. 1967).

19, further forgery warrants were issued and Gockley was transferred from Reading to the State Police Barracks outside of Reading. At approximately 11:00 a. m. on that day, the police and representatives of the district attorney's office questioned Gockley again. At about 3:00 p. m. there had been prepared a typewritten question and answer statement which Gockley signed and in which he related that Mabel Klein had died of natural causes and that, in an altercation with Smith which ensued, he, Gockley, had shot and killed Smith and buried both bodies in a common grave. On that same day Gockley led the police to the gravesite and there he made other damaging admissions. On November 21, Gockley was transferred to the Berks County Prison.

On December 2, 1960, Detective Krause asked Gockley whether he would take a lie detector test. When Gockley replied that he would wait to see his attorney before deciding, Krause discontinued the conversation.

On December 9, 1960, Krause and Feltman interviewed Gockley at Berks County Prison to clear up those portions of his first statement which their investigation had indicated were false. Gockley then told a somewhat different story. He was then removed to Reading to make a formal statement at the District Attorney's office. In that statement, although there were some changes, Gockley again acknowledged that he had shot and killed Clement Smith.[4]

In these proceedings, Gockley contends that his arrest on November 17, 1960, was invalid and that any statements elicited from him thereafter were tainted by the illegality of the arrest. He also charges that his statements were coerced.

After a careful review of the state court records and the testimony presented in this court, I conclude that Gockley's arrest was valid and that his statements were voluntary. The petition for writ of habeas corpus will, therefore, be denied.

### 1. Arrest.

The basis of relator's claim that his arrest was invalid is that the police affidavit (referred to as the "information") submitted to the magistrate [alderman] on the basis of which the arrest warrant issued was inadequate.

The "information" reads as follows:
"That on information received which affiant, upon investigation, verily believes to be true that one EDWIN W. GOCKLEY did fraudulently make, sign, alter, utter and publish a certain check in the sum of $200.00, dated March 8, 1960, payable to cash, and drawn on City Bank and Trust Company of Reading, Pennsylvania, and did sign the name of MABEL L. KLEIN to said check, to the prejudice of said MABEL L. KLEIN and with intent to defraud the said MABEL L. KLEIN Contrary to an Act of Assembly in such case made and provided."[5]

The information contained in the police affidavit is insufficient to support the issuance of a valid warrant of arrest. In order for a valid arrest warrant to issue, there must be presented to the judicial officer sufficient facts from which he may independently conclude that probable cause exists to believe that an offense has been committed and that the accused has committed that offense. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). The information here sets forth the essential elements of the crime, but it fails to indicate any factual basis for the charge against Gockley. Where the written complaint is insufficient, the warrant may yet be sustained if there is

4. In the November 19 and the December 9 statements and in his testimony at the trial, Gockley maintained that Mabel Klein had died of natural causes, that he and Smith quarreled and Smith was accidentally shot. In the two statements he related that he again shot Smith to put him out of his misery whereas at the trial he denied that there were two shots.

5. Respondent's Exhibit No. 1.

proof that the judicial officer was presented with additional information from which he could independently determine that probable cause existed [United States ex rel. Johnson v. Rundle, 280 F.Supp. 453 (E.D.Pa.), aff'd, 404 F.2d 42 (3d Cir. 1968), cert. denied, 395 U.S. 937, 89 S.Ct. 2004, 23 L. Ed.2d 453 (1969)], but there was no such proof here. The issuing magistrate, Alderman Paul C. Brogley, testified but could not recall whether the police gave him any additional information. Since there was no evidence that he was given information in addition to that contained in the written complaint, and since the written complaint is not sufficient, the arrest cannot be upheld as pursuant to a valid warrant.

■■ "Notwithstanding the invalidity of the warrant, the arrest may nevertheless be sustained if the police had probable cause to make an arrest without a warrant."[6] United States ex rel. Johnson v. Rundle, *supra*, 280 F.Supp. at 455; Dearinger v. United States, 378 F.2d 346 (9th Cir.), cert. denied, 389 U.S. 885, 88 S.Ct. 156, 19 L.Ed.2d 183 (1967); Ferganchick v. United States, 374 F.2d 559 (9th Cir.), cert. denied, 387 U.S. 947, 87 S.Ct. 2085, 18 L.Ed.2d 1337 (1967); Hagans v. United States, 315 F.2d 67 (5th Cir.), cert. denied, 375 U.S. 826, 84 S.Ct. 68, 11 L.Ed.2d 58 (1963). Probable cause exists where "the facts and circumstances within [the arresting officers] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ In the instant case the police, through their own investigations, had in their possession the following information: (1) two persons had been missing for six months under mysterious circumstances; (2) Gockley was in control of the real and personal property of these missing persons, and was cashing checks in the name of one of them, Mabel Klein; (3) Gockley had given the police information which turned out, on investigation, to be false; and (4) Gockley had failed for over three months to produce the power of attorney which allegedly authorized him to cash checks for Mabel Klein. Considering all these factors, the police were warranted in believing that Gockley had, without authorization, gained access to the possessions of two missing persons and was forging Mabel Klein's signature to checks for his personal benefit. This was sufficient information to constitute probable cause for Gockley's arrest without a warrant. The arrest was, therefore, valid.

### 2. *Voluntariness of Confessions.*

■■ To be admissible, a confession must be the product of a rational intellect and free will. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037 (1961); United States ex rel. Smith v. Brierley, 267 F.Supp. 274 (E. D.Pa.), aff'd 384 F.2d 992 (3d Cir. 1967). The circumstances surrounding confessions and statements must be examined to determine the cumulative impact on the mind of the person giving the statement. See Moser v. United States, 381 F.2d 363 (9th Cir. 1967), cert. denied, 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 850 (1968); United States ex rel. Heath v. Rundle, 298 F.Supp. 1207 (E.D.Pa.1969). If the totality of the circumstances indicates that a confession was voluntary, it is admissible. Fuller v. United States, 132 U.S.App.D. C. 264, 407 F.2d 1199 (1967); United States ex rel. Kern v. Maroney, 275 F. Supp. 435 (W.D.Pa.1967).

Relator charges that his written and oral statements to the police were the

---

6. An arrest without a warrant is valid under Pennsylvania law if the police had reasonable grounds to believe that the accused had committed a felony. Commonwealth ex rel. McNeair v. Rundle, 416 Pa. 301, 206 A.2d 329 (1965).

product of police coercion. He argues that beginning in July 1960 the police engaged in a campaign of harassment, the purpose of which was to elicit the "truth" as the police perceived it, and that the culmination of this coercive tactic was his two written statements on November 19 and December 9, 1960.

### Pre-Arrest Statements

Gockley first alleges that the police improperly obtained information from him during the pre-arrest interviews by failing to warn him of his constitutional rights.

Gockley was initially questioned as part of a general investigation into the disappearance of Mabel Klein. Much of the questioning was done before the police were even aware that a crime had been committed and at a time when Gockley appeared quite willing to cooperate. At this stage, the police were under no obligation to give him warnings of any kind. Captain Feltman stated that the police began to suspect that something was amiss around September 1960 when Gockley persisted in his failure to produce the power of attorney. On October 20, however, pursuant to a lead furnished by Gockley, the police turned their suspicions on Clement Smith whom they knew to be an ex-convict. It was only after the Smith investigation had been completed and the police had learned of Gockley's involvement in the Smith matter that their suspicions returned to Gockley.

At that point the police moved expeditiously to complete their investigations and arrest him. There was nothing coercive about the pre-arrest conduct of the police and I conclude that Gockley answered all questions voluntarily.

### Post-Arrest Statements

To substantiate his charges of police coercion during the post-arrest custody, Gockley testified that upon his arrest the police did not advise him of the charges against him, did not warn him of his constitutional rights, threatened him, subjected him to prolonged periods of interrogation, and held him incommunicado by denying him a preliminary hearing and by refusing him permission to use a telephone or consult an attorney. Gockley also alleged that he specifically requested a particular lawyer on November 17 and November 19 and that he confessed on November 19 because he became convinced that the police would not be "satisfied until they found the body of Mabel Klein" and would not permit him to communicate with his attorney unless and until he signed a statement. He testified that he then gave a partially truthful statement intending to withhold the "true information" until he contacted his lawyers.[7] Gockley now alleges that throughout this period he was suffering from a personality defect known as "paranoia vira", from which he had a "compulsion to talk" and that the police took advantage of that condition to elicit damaging statements from him.[8]

---

7. The following question and answer appear at p. 227 of the state trial transcript:
"By Mr. Hevalow (Gockley's court-appointed counsel):
Q. You have testified to making a statement on November 19, 1960, which was taken down by a stenographer and transcribed. Will you tell us why you made that statement?
A. (Gockley) Well, I knew the police wouldn't be satisfied until they found the body of Mabel Klein, and I knew that they wouldn't give me any attorneys when I requested them. I tried to give them a story that would sound plausible;

yet I knew deep down in my heart that I had to keep the true information for my attorneys, which I didn't know who I was going to get. I knew that in the statements that I would give, that statements are not statements, are not facts, until they are proven, so I gave them a story I thought they would accept, and they did accept it at that time only to come back later and tell me some of the facts didn't hold water."

8. Gockley has charged that his transfer from Berks County Prison to the district attorney's office on December 9, 1960, is further evidence of the coercive tactics

The police refuted most of Gockley's testimony. Captain Feltman testified that Gockley did not request a lawyer or the use of a telephone while Gockley was in his custody from November 17 to November 21, 1960. Feltman also stated that he advised Gockley of the charges against him and told him he could use a telephone if he so desired. He denied making any threats and explained that the length of some interrogation periods was due, not to harassing tactics by the police, but rather to Gockley's propensity to talk. He recalled that Gockley, after the first written statement, stated that he expected the court to appoint a lawyer for him.

Neither Krause nor Feltman could recall whether Gockley was warned of his constitutional rights immediately upon his arrest, although it is clear that warnings were given at least during the taking of the written statements.[9] Feltman could not recall any reason for not taking Gockley before a magistrate although he admitted that there was adequate time to do so and that forgery was a bailable offense.[10]

I am persuaded that the testimony of the police officers is more credible. Gockley did not impress me as truthful and I simply do not believe his testimony.

Gockley's assertions of police misconduct are grossly exaggerated. Although some of the periods of interrogation were fairly long, that was due, not to police misconduct, but to Gockley's verbosity and propensity for fabrication. The questioning was not repetitive, the police were inquiring about a number of possible crimes. Neither the length of the interrogation periods nor the nature of the questioning was so severe or coercive as to have contributed to Gockley's decision to confess. See Culombe v. Connecticut, supra; United States v. Moriarty, 375 F.2d 901 (7th Cir.), cert. denied, 388 U.S. 811, 87 S.Ct. 2116, 18 L. Ed.2d 1350 ( 1967).

Contrary to Gockley's claim, I am satisfied that he was informed of the charges against him upon his arrest. Feltman specifically recalled that he informed Gockley as to the nature of the charges against him, and his testimony is corroborated by Gockley's admission at his state trial that the first night of questioning dealt only with "a certain check relating to another case." (State Trial Record, p. 223).

Gockley was not held incommunicado. He was aware that he had the right to counsel if he so desired.[11] During the

used by the police. He alleges that the transfer was illegal under 12 P.S. § 1887, since it was not pursuant to court order. Even if this transfer had been illegal, it was not coercive. The transfer was, however, lawful under Pennsylvania law. In the only decision construing this statute, the Pennsylvania Supreme Court has ruled that a court order need not be obtained by a district attorney seeking the presence of a prisoner for questioning. Commonwealth v. Trunk, 311 Pa. 555, 167 A. 333 (1933).

9. & 10. The events in question here predated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), (which are not retroactive, Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966)), consequently absence of warnings in compliance with those rulings does not automatically rule

out the statements, it is only a factor to be considered in determining their voluntariness. Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Likewise, failure to take an accused before a magistrate for a preliminary hearing does not render a statement involuntary per se, but it is a factor to be considered in determining whether statements obtained thereto were coerced. See Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); United States ex rel. Russo v. New Jersey, 351 F.2d 429 (3d Cir. 1965), cert. denied, 384 U.S. 1012, 86 S.Ct. 1916, 16 L.Ed.2d 1018 (1966), vacated on other grounds, 384 U.S. 889, 86 S.Ct. 1914, 16 L.Ed.2d 995 (1966); Young v. Wainwright, 326 F.2d 255 (5th Cir. 1964).

11. From Gockley's prior experiences with the criminal process and police interrogation, and from his statements to Krause and Feltman, I believe that he knew he

period he was in Feltman's custody (November 17–21, 1960), he was told that he could use a telephone if he desired. The officials at the Berks County Prison were given no special instructions restricting Gockley's privileges, consequently during the time he was confined at that institution, he could have availed himself of the same opportunities to communicate as were available to all prisoners. See Gibson v. Peyton, 262 F.Supp. 574 (W.D.Va.1966). That he did not communicate with family or friends was probably due to his family's antipathy [12] to him and to his apparent lack of friends.

My impression of Gockley's credibility is corroborated by the testimony of a psychiatrist, Dr. John H. Bower, who examined Gockley shortly after his arrest. The psychiatrist concluded that Gockley was suffering from a condition known as "paranoia vira." According to Dr. Bower, this condition manifested itself in Gockley's case by delusions of grandeur and a superiority complex which caused him to believe that he would eventually extricate himself from his dilemma by outsmarting the police, the district attorney, and the judge and jury. In an attempt to outwit these adversaries, Gockley fabricated stories which were based partially on fact and partially on fiction.

In my view, Gockley's personality defect is the key in determining whether his statements were voluntary. Gockley's actions throughout this entire period were consistent with Dr. Bower's opinion of Gockley's feelings of superiority. I believe that from July 15, 1960 until December 9, 1960, Gockley willingly engaged in a battle of wits with the

police, and he gave them information, some true, some false, in an attempt to outsmart them.[13]

It is my belief that no amount of warning would have caused Gockley to remain silent. He talked, not out of fear or coercion, but because he wanted to talk, because he wanted to prove how clever he was. He has exhibited the same tendency in court proceedings. For example, he told his state trial counsel that he wanted to take the witness stand because "he had the ability to make a good impression on the jury" (Habeas Corpus hearing of August 14, 1967, p. 27), and he insisted on testifying in this court against the advice and over the objection of his very able attorney. There is other evidence of that same trait in his furnishing false information to the police to throw them off in their investigations and, finally, in the written statements themselves in which he seems to have combined truth and fiction in a manner calculated to exculpate himself from criminal responsibility for the deaths of two persons.

From all that appears, the police were unaware of Gockley's personality defect and they cannot, therefore, be charged with having taken advantage of the condition. Gockley appeared willing to cooperate, and the police accepted his offers. Despite his personality defect, Gockley's mental condition was such that he was able to make rational decisions and he understood what he was doing.[14]

In summary, Gockley was not subjected to inherently coercive interrogation; he was not held incommunicado; he was warned of his right to remain silent and that anything he said might be used against him at least

had the right to court-appointed counsel, but chose to attempt to outwit the police without the aid of counsel.

12. Testimony of relator's brother, Reverend Robert W. Gockley, before the State Sanity Commission.

13. "Oh what a tangled web we weave, When first we practise to deceive!" Sir Walter Scott, MARMION, Introduction to Canto VI, Stanza 17.

14. After a full and fair hearing before a Sanity Commission appointed by the state courts, the commission reported that Gockley, although not completely normal, was competent to stand trial, and was not suffering from any mental illness. He is a high school graduate with at least average intelligence.

twice; and he knew he had a right to court-appointed counsel. His written and oral statements were not the product of police misconduct. His decision to confess was due entirely to his desire to outsmart the police and to his belief that he could do so. In effect, the police were "midwife to a declaration naturally born of * * * calculation." Culombe v. Connecticut, *supra,* 367 U.S., at 576, 81 S.Ct. at 1864. Under the circumstances, I conclude that Gockley's confessions and statements were the product of a rational intellect and free will.

Gockley has strenuously argued here that the instant case is controlled by the Supreme Court decisions in Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949) and Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed. 2d 423 (1967). I do not find these cases controlling. The factual situations are entirely different than the instant case. In *Turner,* the accused was arrested without a warrant and without probable cause; the accused was not informed of his rights, nor was he advised of the charges pending against him; he was subjected to prolonged, constant and repetitive questioning by teams of police officers for five days; and finally, he confessed only after the police had tricked him into believing that two coconspirators had confessed. The circumstances were even more aggravated in the *Clewis* case. There, the accused was arrested at 6:00 a. m. on a Sunday morning. For the next thirty-eight hours he was given little food and sleep, was constantly questioned by the police and eventually confessed. He was then taken before a magistrate for a hearing, but he was not informed even then of his constitutional rights. For the next week, he was transferred from prison to prison, driven on a round trip of approximately 600 miles, administered lie detector tests, given little food or sleep, held incommunicado, questioned constantly, and finally confessed a second time. A third confession was elicited a few days later after the police misconduct had ceased, but the Supreme Court held all three confessions inadmissible.

Neither the physical nor the psychological pressures evidenced in *Turner* and *Clewis* are presented here. Gockley knew his constitutional rights; he was lawfully arrested and was not subjected to threats, promises, or artifices, and was well-cared for on a physical plane. His confessions were not the result of coercive police pressure, they were the result of a shrewd attempt to outwit his antagonists. As a product of his own mind's calculation, the confessions were voluntary. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1914).

The petition for writ of habeas corpus will be denied.

The court expresses its appreciation to H. Robert Fiebach, Esquire, who, pursuant to appointment by the Court of Appeals has, without remuneration, diligently and conscientiously represented relator's cause both in the Court of Appeals and in this court.

### ORDER

It is ordered, this 10th day of July, 1970, that the Petition of Edwin W. Gockley for Writ of Habeas Corpus be and it is hereby denied.

There is probable cause for appeal.