**UNITED STATES of America ex rel. Edwin GOCKLEY, Appellant,**

v.

**David N. MYERS, Superintendent, State Correctional Institution, Graterford, Pennsylvania.**

No. 19209.

United States Court of Appeals, Third Circuit.

Argued March 5, 1971.

Decided Sept. 20, 1971.

Certiorari Denied Jan. 24, 1972. See 92 S.Ct. 738.

Adams, Circuit Judge, filed dissenting opinion.

OPINION OF THE COURT

HASTIE, Circuit Judge.

Appellant Gockley, a state prisoner, is serving a ten to twenty year term of imprisonment after conviction of murder in the second degree of Clement Smith. The conviction was affirmed by the Supreme Court of Pennsylvania. Commonwealth v. Gockley, 1953, 411 Pa. 437, 192 A.2d 693.

In a petition to the district court for habeas corpus Gockley has alleged that his conviction was unconstitutionally obtained through the use of an involuntary confession extracted while he was under illegal arrest.[1] After a full hearing the district court held that the questioned confession was made voluntarily while the accused was under lawful arrest. Accordingly, the petition was denied. E.D.Pa.1970, 314 F.Supp. 839. This appeal followed.

We consider first the circumstances of Gockley's arrest as established by the record. Properly concerned about the March, 1960 disappearance of Mabel Klein, a local resident, the Reading police sought intermittently for several months to discover her whereabouts. In August, hearing that Gockley had been seen working on the Klein premises, police Captain Feltman questioned him about the missing woman. He explained that she had gone to Georgia, that she had left him with a power of attorney and a contract to make some repairs on her property, and that she telephoned him periodically. Feltman asked Gockley to bring in for inspection the contract and the power of attorney. Feltman questioned Gockley again in September and again asked to see the documents mentioned and requested during the earlier interview. Feltman and Gockley met again, apparently by chance, in October and Gockley mentioned Clement Smith as a person likely to have informa-

H. Robert Fiebach, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant.

Arthur Ed. Saylor, Sp. Asst. Dist. Atty., Edelman, Schaeffer, Saylor, Readinger & Poore, Reading, Pa., for appellee.

Before HASTIE, Chief Judge,* and ADAMS and GIBBONS, Circuit Judges.

* Chief Judge at time of argument; became Senior Circuit Judge before decision.

1. Two earlier appeals to this court in this case were decided without reaching the merits of the petitioner's contentions. 1967, 378 F.2d 398; 1969, 411 F.2d 216. The involved history of the litigation is set out in our 1969 opinion.

tion about Mabel Klein. Upon inquiry, the police discovered that Smith also had disappeared and learned that, upon the basis of an authorization purportedly signed by Smith, his personal effects had been surrendered to Gockley. On October 31, the police once more asked to see the power of attorney and the repair contract. On this occasion they accompanied Gockley to his home where he produced and surrendered two documents, both bearing the purported signature of Mable Klein. On November 14, Captain Feltman sent the documents to the Federal Bureau of Investigation in Washington for hand writing analysis. Expert examination indicated that the signatures probably were not genuine and in December the documents were returned to Feltman.

■ In the meantime, on November 16, two days after the documents had been sent to Washington, a Policewoman Wanger appeared before a magistrate and executed and submitted her affidavit as follows:

"That on information received which affiant, upon investigation, verily believes to be true that one EDWIN W. GOCKLEY did fraudulently make, sign, alter, utter and publish a certain check in the sum of $200.00 dated March 8, 1960, payable to cash, and drawn on City Bank and Trust Company of Reading, Pennsylvania, and did sign the name of MABEL L. KLEIN to said check, to the prejudice of said MABEL L. KLEIN and with intent to defraud the said MABEL L. KLEIN contrary to an Act of Assembly in such case made and provided."

Upon the basis of this affidavit, the magistrate issued a warrant for Gockley's arrest for alleged forgery. Subsequently, the magistrate testified that he had no recollection whether he was given any other information than that set out in the affidavit. The state has offered no proof that anything more was told to the magistrate.

The district court, appropriately citing Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 held the warrant invalid because it did not appear from the affidavit or otherwise that the magistrate was supplied with particular facts from which he could reasonably have reached an independent conclusion that there was probable cause to believe that Gockley had forged the checks in question. We agree that the present record compels the conclusion that the arrest warrant was invalid. *Cf.* Whiteley v. Warden, decided March 29, 1971, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306.

On November 17, a Reading police captain and a state police officer took Gockley into custody under the illegal arrest warrant. However, the district court held, as urged by the appellee, that the arrest was legal because the police had enough incriminating information to constitute probable cause justifying an arrest without a warrant.

■ Since Gockley was arrested on a charge of forging a specified check, our inquiry must be whether the police had information which would "warrant a man of reasonable caution in the belief" that he had forged that document, Carroll v. United States, 1925, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543. It is not enough that the information at hand sufficed to arouse suspicion. Henry v. United States, 1959, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134.

■ Certainly Gockley's statements about the disappearance of Smith and Miss Klein, coupled with the subsequent inability of the police to find any confirmation of his assertions concerning their whereabouts, were suspicious circumstances. So too was his delay in producing Miss Klein's "power of attorney." Yet there is nothing to show that the signatures on the documents he ultimately produced and surrendered or on the check upon which the charge of forgery was based were obvious forgeries. Indeed, the action of the police, some two weeks after Gockley surrendered the document and only two days before they sought a warrant for

his arrest, in sending the power of attorney to the FBI for report whether or not it seemed genuine indicates that at the time of the arrest, the police were merely suspicious of Gockley's conduct and doubtful about the authenticity of the documents. Without more to confirm those proper suspicions we think that the arrest must be characterized as having been made without probable cause.

We conclude that Gockley's arrest on November 17 and his detention through November 19, the day during which he made an incriminating statement concerning Smith's disappearance that thereafter was introduced in evidence against him on a subsequent charge of murdering Smith, were illegal.

■ This brings us to the question whether the relation of the illegal arrest and detention to the prisoner's statement was such as to make the subsequent use of that statement as evidence against him a denial of due process of law, regardless of any other coercive circumstances.

In Mapp v. Ohio, 1961, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 the Supreme Court announced that *"all* evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." (italics added) Two years later, in Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441, the Court made the admissibility of challenged statements of suspects after their illegal arrest turn on the question whether the statements had "been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 488, 83 S.Ct. 417.

Judge, now Chief Judge, Friendly, concurring in Collins v. Beto, 5th Cir. 1965, 348 F.2d 823, has pointed out that *Wong Sun* involved statements of two accused persons and that the rationale of the decision is illuminated by the Court's invalidation of the statement of one but not of the other:

" * * * Wong Sun prohibits the introduction in a state criminal trial of a confession that is the result of an arrest violating the Fourth Amendment, just as Mapp prohibits the reception of an object obtained through an unconstitutional search. Where the problems become different is the less clear causal relation between the unconstitutional act and the 'fruit.' When the police, by a search violating the Fourth Amendment, seize contraband or overhear a conversation disclosing the location of stolen goods, the connection between the unconstitutional intrusion and the booty offered at trial is so automatic and inevitable that the latter is readily seen as the 'fruit' of the unconstitutional act. But when the object improperly seized is a person and the alleged 'fruit' is a statement by him, there intervenes the individual's own decision to speak. In Wong Sun itself the causal problems were at the temporal extremes. Toy's statement, which the Court required to be excluded along with the narcotics to which it led, came directly after '[s]ix or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping' and '[h]e had been almost immediately handcuffed and arrested.' 371 U.S. at 486, 83 S.Ct. at 416. By contrast, Wong Sun's statement, held to have been properly admitted despite his unlawful arrest, was made after he 'had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement * * *.' 371 U.S. at 491, 83 S.Ct. at 419." 348 F.2d at 834–835.

Also illuminating is the more recent case of Davis v. Mississippi, 1969, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, where the question was whether due process required the exclusion of fingerprints obtained in booking a prisoner after an illegal arrest. In excluding

such evidence, the Court analogized and affirmed the rule of *Wong Sun,* saying:

"We agree with and adopt the conclusion of the Court of Appeals for the District of Columbia Circuit in Bynum v. United States, 104 U.S.App.D.C. 368, 370, 262 F.2d 465, 467 (1958):

'True, fingerprints can be distinguished from statements given during detention. They can also be distinguished from articles taken from a prisoner's possession. Both similarities and differences of each type of evidence to and from the others are apparent. But all three have the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention. If one such product of illegal detention is proscribed, by the same token all should be proscribed,' " 394 U.S. at 724, 89 S.Ct. at 1396.

True, as Judge Friendly pointed out in his above quoted analysis, the direct causal relation between an arrest and an incidental seizure of an article in the possession of the person arrested, or between an arrest and the fingerprinting required in the booking of all arrested persons, is clear and direct. On the other hand the relation between an arrest and a statement given during the consequent detention may be more attenuated. But the *Davis* opinion shows that all are to be treated alike, at least so long as the evidence obtained can fairly be said to be the "fruit" or "product" of the arrest.

This court has recognized the causal issue that is relevant where a statement is obtained during illegal police detention following an illegal arrest. In Commonwealth of Pennsylvania ex rel. Craig v. Maroney, 1965, 348 F.2d 22, we said:

"There are two factors which seem to be of major significance in determining the relationship between an illegal arrest and, as here, the subsequent confession:

(a) the proximity of an initial illegal custodial act to the procurement of the confession; and

(b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest." 348 F.2d at 29.

The arrest of Gockley on November 17 was much more than a *causa sine qua non* of his November 19 statement during the resulting detention. The record compels the conclusion that the very purpose of the arrest on a charge of forgery was to obtain and maintain such control over him as would facilitate persistent and effective interrogation about the disappearance of Smith and Miss Klein. This deliberate misuse of arrest is underscored by the fact that Gockley was never granted an arraignment or a bail hearing on the forgery charge. At the hearing in the district court on this petition for habeas corpus, Captain Feltman, the Reading police officer who had been in charge of the Gockley case, was asked why Gockley was not taken before a magistrate. He replied that he did not know, except that they were questioning him. Moreover, much of the questioning was addressed to the obtaining of information about the disappearance of Smith and Miss Klein, rather than the forgery charge upon which he never was prosecuted.

While Captain Feltman's several statements in the record as to the length of the periods of interrogation are to some extent conflicting, fairly read they show police interrogation of the prisoner for several hours during the evening of November 17, shortly after his arrest. He was questioned again during the day of November 18. And that night he was questioned from 7:00 or 8:00 p. m. to 11:30 p. m. or 12:15 a. m., depending upon which of Captain Feltman's statements of his recollection is accurate.

During the morning of November 19, the prisoner was removed from the City

Hall lockup to the State Police Barracks outside of the city, admittedly to facilitate questioning. Interrogation continued from 11:00 a. m. until 2:00 p. m. by which time the information incorporated in the statement bearing that date had been obtained. During the interrogation of November 19, there was some discussion of counsel. Gockley's testimony is that he requested counsel and was told that he could not have counsel until the police had a sufficient case against him. Captain Feltman's stated recollection was: "I didn't at no time say I would see the judges to get him—who am I to see the judges to get him a lawyer?"

On the transcripts of the trial and the habeas corpus hearings, we find the conclusion inescapable that, knowing they had insufficient evidence to prosecute Gockley, the police arrested and detained him for the purpose of questioning him without interruption, at greater length and more frequently and effectively than could have been done while he was at large, and thus building a criminal case against him. And this intended result was achieved. The "fruit" which the police intended to harvest and did harvest from the illegal arrest and detention was the very statement that is now challenged. That statement was "directly derived from, and thereby tainted by * * * [Gockley's] illegal arrest" and detention. See Commonwealth ex rel. Craig v. Maroney, *supra*, 348 F.2d at 29.

In these circumstances, there is no need to inquire whether the prisoner was forced to talk or merely induced to do so without coercion beyond that inherent in persistent interrogation during illegal detention. If the police are to be deterred from using illegal arrest and detention as a means of obtaining self-incriminating statements, evidence thus obtained must be excluded.

A second statement made by Gockley on December 8 was also introduced in evidence. It purports to be an amplification and correction of what he said on November 19. Gockley had remained in custody during the intervening period. He had been subjected to further interrogation. He had not had access to counsel. Indeed, he had not communicated with anyone but the police.

■ True, on the basis of the November 19 statement a warrant had been issued charging him with murder and his detention thereafter may be viewed as grounded upon that charge. But because he never was free to communicate with friends or counsel and made the second statement as an amplification of the first, the invalidating taint of the first statement infected the second as well. Both were fruits of the illegal November detention for the purpose of interrogation.

■ The dissenting opinion correctly poses the critical questions in this case: whether Gockley's arrest was illegal and, if so, whether his statements to the police were the "fruits" of such illegal arrest. The record shows without significant conflict in testimony the facts known to the police when they arrested Gockley on a charge of forgery. What divides the court is a difference in judgment whether those facts sufficed to create in the mind of a reasonably cautious man anything more than suspicion that Gockley had forged a signature on the check in question.[2] Similarly, the relation of arrest and detention to the prisoner's admissions does not depend upon any dispute as to what in fact happened. We differ only in the significance we attach to essentially undisputed facts.

The majority find the relation of cause and effect between illegal detention and the detainee's statement to be direct and unmistakable, particularly since it is clear that detention was intended to fa-

---

2. We think the dissenting opinion is mistaken in its thought that petitioner's counsel conceded at argument that the police had probable cause to arrest Gockley before he produced the power of attorney. And even if such a concession had been made, it would not have relieved the court of its responsibility of decision on the point.

cilitate further interrogation needed to build a case, rather than the prompt charging of the suspect on evidence already at hand. We have pointed out in this connection that the excuse given by the police for not taking Gockley before a magistrate was that they still were questioning him. The dissenting opinion counters with the argument that the fact that 44 hours (of which 12 or 15 were devoted to interrogation) elapsed between arrest and completion of the prisoner's first statement "provided ample time for dissipation of any taint obtaining from the arrest." But the wrong in this case, the "taint," is not merely the illegality of the initial arrest but also the illegality of the continuing detention pursuant to illegal arrest for the purpose of controlled, persistent and repeated questioning such as could not have been accomplished without arrest and detention. "It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'" Frankfurter, J., in Mallory v. United States, 1957, 354 U.S. 449, 456, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479. This is as true of state officers as of the federal officers whose conduct Mr. Justice Frankfurter condemned.

■ The dissent also reasons that testimony to the effect that Gockley suffered from "paranoia vira," a condition that made him a compulsive talker with "delusions of grandeur," somehow insulated the illegal arrest and detention from the prisoner's statements. But when the illegal detention is intended to and does enable the police to question the suspect more persistently and effectively than otherwise would have been possible, the fortuitous circumstances that a trait of personality may have facilitated the enterprise is beside the point. We are dealing with a consequence of violation of the Fourth Amendment, not a question whether a confession was coerced within the meaning of the Fifth Amendment. Indeed, this point in the dissent-

ing argument amounts to no more than saying that Gockley's personality defect may have made unconstitutional procedure work better than it might have worked with some other suspect.

Part III of the dissenting opinion addresses itself to the question whether Gockley's statements were so coerced that their procurement violated his Fifth Amendment privilege against compulsory self-incrimination, despite the fact that the court has not found it necessary to decide or even discuss that question in this opinion. Rather, we have undertaken to demonstrate that the evidence in question was the product of illegal arrest and detention, and thus was obtained in violation of the Fourth Amendment guarantee against unreasonable search and seizure. We now observe merely that the Fifth Amendment issue dealt with by the dissent is not free from doubt, since it required between 12 and 15 hours of interrogation during a 44-hour period of detention to obtain the challenged statement; throughout this period the prisoner was denied counsel, and the police would not take him to a magistrate until they had obtained the admissions they sought. In cases of this sort, there is no sure way of locating the boundary between persuasion and coercion. And there is no need to make the attempt here.

■■ Part IV of the dissenting opinion questions whether "federal habeas corpus is an appropriate vehicle for the vindication of the fourth amendment rights" that have been violated in the manner of procuring otherwise competent evidence. The short, but in a lower court conclusive, affirmative answer to this question has been given by the Supreme Court in the already quoted dispositive language of Mapp v. Ohio, *supra,* that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." The Court has consistently adhered to that holding. The dissent finds comfort in the fact that dissenting Justices occasionally have expressed dissatisfaction with the *Mapp*

rule. But that does not make it any less binding upon us. Indeed, Chief Justice Burger, in his most recent and elaborate criticism of the *Mapp* rule has been at pains to add that he would not "abandon the Suppression Doctrine until some meaningful alternative [statutory remedy against governments for police violations of Fourth Amendment rights] can be developed." *See* Bivens v. Six Unknown Fed. Narcotics Agents, decided June 21, 1971, 403 U.S. 388, 420, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619. Otherwise, he feared that the police might gain the impression that "an open season on 'criminals' had been declared." *Id.*

This does not mean that the majority would subscribe to the dissenting view if this court were free to do so. More than ten years ago, the writer of this opinion attempted to state the rationale of decisions like this in Bynum v. United States, 1958, 104 U.S.App.D.C. 368, 262 F.2d 465, 468–469, and language there used has been quoted with approval as recently as Davis v. Mississippi, 1969, 394 U.S. 721, 725, n. 4, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676:

> " * * * [T]he matter of primary judicial concern in all cases of this type is the imposition of effective sanctions implementing the Fourth Amendment guarantee against illegal arrest and detention. Neither the fact that the evidence obtained through such detention is itself trustworthy or the fact that equivalent evidence can conveniently be obtained in a wholly proper way militates against this overriding consideration. It is entirely irrelevant that it may be relatively easy for the government to prove guilt without using the product of illegal detention. The important thing is that those administering the criminal law understand that they must do it that way. * * * "

Mr. Justice Brennan, speaking for the Court in Miller v. United States, 1958, 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 2 L.Ed.2d 1332, expressed the central concept this way:

> "We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness. * * * * "

In the *Mapp* case itself, Mr. Justice Clark stated in some detail why, in the Court's view, the Fourth Amendment requires "that no man is to be convicted [in a state or federal court] on unconstitutional evidence." 367 U.S. at 657, 81 S.Ct. at 1692. He considered and rejected the often repeated complaint that the "criminal is to go free because the constable has blundered." Ordinarily, it is not the "blundering" constable but the official who deliberately uses constitutionally prohibited means of obtaining evidence, as was done in Gockley's case, whose work product cannot constitutionally be used as evidence. Moreover, it is not ordered in these situations that the "criminal go free," but rather that the accused be retried on constitutionally acceptable evidence. It is this requirement that, in Mr. Justice Clark's words, "founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." 367 U.S. at 660, 81 S.Ct. at 1694.

One other innovation proposed by the dissenting opinion calls for comment. It is argued that federal habeas corpus should not be granted to a prisoner who has been convicted by a state court, absent an allegation and some indication of ultimate innocence by the

prisoner. And it is concluded that habeas corpus should be denied here because Gockley has not asserted his innocence and the evidence of guilt is substantial.

■■■ Of course Gockley pleaded not guilty at his arraignment, so it is not clear what would be gained by requiring him to do so again in his petition for habeas corpus. In any event it is proposed that beyond asserting innocence, the petitioner should be required to persuade the federal court that there is some substantial doubt of his guilt. Presumably, if this requirement were imposed, both sides would be entitled to introduce evidence on the issue of guilt or innocence in the habeas corpus proceeding. At the conclusion of this quasi-trial, the federal court would be entitled to deny habeas corpus on the ground that the state record and whatever new evidence had been introduced left the court convinced of the petitioner's guilt. In the view of the majority, such inquiry whether the accused is guilty is a role appropriate only for the courts of the accusing state. The federal courts should confine their inquiry to the fairness of the state procedure that led to conviction. Of course if the unfair procedure clearly did not prejudice the accused, it could properly be disregarded. Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. But here the challenged admissions of the prisoner provided the only basis upon which the jury could have found malice aforethought.

In sum, the dissenting opinion expresses considerably more than a preference for the rule of Wolf v. Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, rather than Mapp v. Ohio, *supra*, that overruled *Wolf*. It seems to advocate retreat on a rather broad front from principles and concepts that now govern federal action upon applications of state prisoners for habeas corpus. For the reasons we have stated, this court is not persuaded that such retreat is permitted under the authoritative pronouncements of the Supreme Court.

The judgment will be reversed. The district court will order the release of Gockley unless, within a reasonable period to be specified in that court's order, the state shall grant the prisoner a new trial.

ADAMS, Circuit Judge (dissenting).

In this case we are being asked to set aside the conviction of a man who killed his friend, secretly buried in a common grave the friend's body and that of a woman whose death precipitated the homicide, and for eight months attempted to conceal the deaths and delude the police by leading a triple life based upon lies and forged documents. The facts of this case have been extensively reported before,[1] and will not be repeated

1. The trial was conducted by the Honorable Warren Hess, an experienced state trial judge, before a jury. The direct appeal from the judgment of the trial court was affirmed by the Pennsylvania Supreme Court. Commonwealth v. Gockley, 411 Pa. 437, 192 A.2d 693 (1963). Certiorari was not sought. Gockley then petitioned to the United States District Court for the Eastern District of Pennsylvania for habeas corpus. The petition was denied without hearing by Judge Luongo. This Court remanded the case to the District Court to determine whether Gockley had waived his constitutional points, Judge Kalodner dissenting on the ground that counsel had twice declined to object to the admission of the statements. United States ex rel. Gockley v. Myers, 378 F.2d 398 (3 Cir. 1967). On remand, the district court, Luongo, J., found that Gockley's counsel had not deliberately by-passed state procedures, and had not waived the alleged constitutional defects, but that the state courts should decide the issue of voluntariness. 276 F.Supp. 748 (1967). This Court, sitting en banc, affirmed the district court's holding as to the waiver issue, but held that special circumstances required that the voluntariness issue be determined in the federal system. 411 F.2d 216 (1969). Certiorari was denied. 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96. Judge Luongo then held an additional hearing, and ruled that the arrest was valid and the statements had not been coerced. 314 F. Supp. 839 (1970).

here except insofar as they may be essential to the discussion.

A principal element of proof against petitioner consisted of two statements made by him after his arrest.[2] Petitioner contends that his arrest was invalid because the affidavit in support of the warrant of arrest was insufficient and because the police lacked probable cause for the arrest, in any event. He also alleges that the two statements were coerced. For these reasons, contends petitioner, the statements obtained subsequent to the arrest were inadmissible,[2a] and a conviction based on them is a violation of the Federal Constitution.

There was some question at oral argument as to which party has the burden of proof regarding the admission into evidence of the statements in question. Since a petition for habeas corpus is a civil action, it is clear that the burden of proof is on petitioner.[3] In accordance with this precept, we must determine whether petitioner demonstrated that his arrest and detention were illegal and if so whether his statements constituted the "fruits" of such illegal arrest or whether he demonstrated that the statements were involuntary or coerced.

I

The first substantive question concerns the legality of petitioner's arrest and detention. That the forgery warrant upon which the arrest was based is patently invalid is beyond cavil. Whiteley v. Warden of Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). However, that fact alone does not vitiate the arrest if the arresting officers in fact had probable cause to believe that a felony had been committed.[4]

2. In his first statement, Gockley acknowledged that he shot Smith twice: once as a result of accident or self-defense, and once to put him out of his misery. In the second statement, he verified that two shots had been fired into Smith. At trial, Gockley claimed that only one shot had been fired. In any event, it is uncontroverted that Gockley shot Smith and that Smith died as a result.

2a. The statements were admitted without objection. However, Gockley's counsel requested that the trial judge charge the jury on the issue of voluntariness. No objection was made to the charge as given. Apparently for this reason, a copy of the charge is not part of the record before this Court.

3. Allen v. Perini, 424 F.2d 134, 138 (6th Cir., 1970); accord, United States ex rel. Gallagher v. Brierley, 286 F.Supp. 773, 774 (E.D.Pa.1968). See also, Hawkins v. Bennett, 423 F.2d 948, 951 (8th Cir. 1970).

That the burden of sustaining the admissibility of challenged evidence lies with the Government once the primary illegality has been established at a suppression hearing or trial, see, 3 C. Wright, Federal Practice and Procedure, Criminal § 677 at 138 (1969), is not significant here, since the issue in a habeas corpus case is· not whether the evidence passes muster when measured against the appropriate evidentiary rule.

Habeas corpus in the federal courts is a remedy grounded on a federal statute, 28 U.S.C. § 2254 (Supp. V 1970), for relief from violations of the Constitution of the United States. Some federal courts look to state law to determine the party who must carry the burden. See e. g., Webb v. Beto, 415 F.2d 433, 436 (5th Cir. 1969), cert. denied, 396 U.S. 1019, 90 S.Ct. 587, 24 L.Ed.2d 511 (1970). However, even if Pennsylvania law does control such aspect of this federal habeas corpus action, Pennsylvania also places the burden of proof on the habeas petitioner. Commonwealth ex rel. Harbold v. Myers, 427 Pa. 117, 233 A.2d 261 (1967) (because Escobedo is not retroactive, a prisoner alleging coercion must demonstrate confessions were involuntary); Commonwealth ex rel. Storch v. Maroney, 416 Pa. 55, 204 A.2d 263 (1964) (petitioner must show violation of constitutional rights). Also, the burden of proof does not shift merely because the petitioner is challenging the voluntariness of his confession. United States ex rel. Sabella v. Follette, 432 F.2d 572, 575 (2d Cir. 1970); Jones v. Russell, 396 F.2d 797 (6th Cir. 1968).

4. Counsel for petitioner has cited to us footnote 8 of Whiteley, supra, which states that "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but

Here, the arrest was made by the two police officers who were most intimately involved with the matter, Captain Feltman of the Reading Police and Detective Krause of the Pennsylvania State Police. These policemen were armed with a battery of facts cumulated during a lengthy investigation.

By the middle of April, 1960, the police knew that Mabel Klein had disappeared approximately a month earlier. While investigating her disappearance, they discovered that Gockley had been seen on her property. In July, Captain Feltman, the detective in charge of the investigation, learned that Gockley was again in Mrs. Klein's apartment, and had Gockley brought to City Hall for questioning. Gockley was very cooperative at that meeting; he told the police that he had a contract and power of attorney authorizing him to renovate the building, that Mrs. Klein had married and moved south, and that she called him every Friday.[5] Feltman then asked to see the contract and power of attorney, and to be notified if Gockley was again contacted by Mrs. Klein. The next meeting between Gockley and the police occurred in September of 1960. This meeting, like the one before it, was also prompted by Gockley's presence on Mrs. Klein's property. When questioned about the contract and power of attorney, Gockley claimed that he stopped working because he had not heard from her. The third meeting occurred on October 20, 1960, while the police were questioning Ethel Briggs about Mabel Klein's disappearance.[6] Gockley appeared at the door and suggested that the police check with Clement Smith. Pursuing this lead, the police discovered that Smith also had disappeared in March, that Gockley possessed the key to Smith's room and had attempted to remove his possessions but was denied permission by the landlady, that the landlady then received a note of authorization purporting to be from Smith, and that Gockley thereafter squared accounts with her and removed Smith's mail and furniture. By this time, the police had come into possession of checks and other documents which purported to bear Mrs. Klein's signature and which were suspected to be forgeries.[7] Furthermore, Captain Feltman testified both at the trial and the hearing that after the September meeting he had been travelling "all over the eastern part of the State of Maryland in this case and West Virginia and Washington, Philadelphia, and many other places" checking on leads.[8]

not disclosed to the issuing magistrate." But the district court in this case did not reach a contrary result, see 314 F.Supp. at 843, and since no one here is attempting to validate the warrant, *Whiteley* is clearly inapposite on this point. Also, in *Whiteley*, the arrest was not made by the affiant or officers under his immediate direction, but rather by the police of a distant community whose only knowledge of the matter was a radio bulletin citing the warrant, which later was determined to be invalid, as authority for the arrest. Without the warrant, the arresting police had no independent facts upon which to base their judgment of probable cause. Footnote 8 just does not reach the issue whether an arrest may be justified by facts *known by the arresting officer* but not presented to the issuing magistrate.

5. Gockley did not have a telephone at his residence.

6. Apparently Ethel Briggs was Gockley's ex-wife.

7. At oral argument, there was a dispute whether the document bore Mabel Klein's signature or Gockley's as attorney-in-fact. Captain Feltman testified on cross-examination at the habeas corpus hearing that the signatures on the documents purported to be Mrs. Klein's. *On this basis, the district judge found that Gockley had been cashing checks in Mrs. Klein's name.* We are bound by this finding unless it is clearly erroneous, and there is nothing in the record which so indicates.

8. These travels were probably prompted by letters purportedly mailed by Mrs. Klein from those places to various people in Reading. In his first statement Gockley described how he mailed (or caused to be mailed) these letters in order to allay suspicion as to the cause of Mrs. Klein's disappearance. Even if Gockley's statements were not considered, it is obvious that the purpose of the trips was to check out leads, and that this phase of the investigation was unsuccessful.

At oral argument, counsel for petitioner conceded that in late October, the police did have probable cause to arrest Gockley for forgery. He contended, however, that Gockley's voluntary production of the contract and power of attorney on October 31, 1960, must necessarily have caused the police, as reasonable, prudent men, to reduce their beliefs to mere suspicions. The majority opinion indicates that the action of the police in sending the documents to the FBI for analysis indicates that the police were "merely suspicious of Gockley's conduct and doubtful about the authenticity of the documents." However, one cannot say, as a matter of law, that merely because the police were "doubtful about the authenticity of the documents" their production was sufficient to destroy the reasonable belief of prudent men that the crime of forgery had been committed by Gockley.[8a] Therefore, I would conclude that the district court did not commit reversible error when it ruled that the arrest was valid and that petitioner had not met his burden of proving that there was no probable cause for the arrest.

Petitioner asserts that his continued detention without a hearing before a magistrate was also illegal, and for this additional reason his statements should have been excluded. If he had been tried in a federal court, this claim would have merit. In the federal system, delay between an arrest and the hearing invalidates confessions obtained during the intervening period of delay only because the Supreme Court has exercised its supervisory powers to insure compliance with Rule 5 of the Federal Rules of Criminal Procedure, requiring the arresting officers to take the accused to a commissioner without unnecessary delay. *See* Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). However, in a state case mere delay between arrest and presentment does not constitute a basis for granting habeas corpus unless state law renders confessions obtained during that period inadmissible. Delaney v. Gladden, 397 F.2d 17, 20 (9th Cir. 1968), cert. denied, 393 U.S. 1040, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969); *see* Webb v. Beto, *supra*, n. 4. Pennsylvania law at the time of Gockley's arrest made it clear that "although regrettable and to be discouraged, the absence of an immediate preliminary hearing, per se, constitutes no violation of petitioner's constitutional rights." Commonwealth ex rel. Fox v. Maroney, 417 Pa. 308, 207 A.2d 810 (1965), *accord*, Commonwealth ex rel. Wilkes v. Maroney, 423 Pa. 113, 222 A.2d 856 (1966). To be entitled to federal habeas corpus relief, petitioner must show prejudice flowing from the illegal detention. *See* Commonwealth ex rel. Smith v. Rundle, 423 Pa. 93, 223 A.2d 88 (1966). Petitioner has failed to meet this burden. *See* Section III, *infra*.

II

Even if the arrest of Gockley had been illegal under Pennsylvania law, that fact alone would not entitle him to the relief he seeks. Streeter v. Craven, 418 F.2d 273, 274 (9th Cir. 1969); Lopez v. Burke, 413 F.2d 992, 993–994 (7th Cir. 1969); Abraham v. Wainwright, 407 F.2d 826, 828 (5th Cir. 1969).

Petitioner must not only show the existence of an illegal arrest, but also that as a result of the arrest he confessed and such confession was admitted into evidence to his prejudice. *See* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, in *Wong Sun*, the Supreme Court held that a confession "attenuated" from an illegal arrest by intervening circumstances was admissible. Thus if the statements here were so attenuated from the illegality as to dissipate the taint, if any, petitioner would not be entitled to the relief sought.[9]

---

8a. It is significant that the majority concedes that the validity of the arrest is a matter of "judgment."

9. It should be noted that our Court remanded this case to the district court so that it could "now decide the voluntari-

In Commonwealth of Pa. ex rel. Craig v. Maroney, 348 F.2d 22 (3rd Cir. 1965), this Court stated that two significant factors in determining whether a confession is tainted are the elapsed time between the arrest and the confession, and the existence of other circumstances so "that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest." 348 F.2d at 29. Thus, it is clear that a significant time lapse plus intervening circumstances can purge the poison from the fruit. *Id.*, at 30.[10]

The lapse of 44 hours between Gockley's arrest and the recordation of the first statement provided ample time for the dissipation of any taint obtaining from the arrest. In view of the voluntary nature of the statements,[11] it follows ineluctably that dissipation did occur during that time span, and the most significant operative factor which contributed to it was Gockley's own personality. Dr. Bower, a neuropsychiatrist who examined Gockley shortly after the arrest, testified that Gockley suffered from paranoia vira, a condition which manifested itself by delusions of grandeur, a tendency toward bragging, compulsive talking, and verbal fencing. The finding by the district court that Gockley was quite willing to talk to the police is amply borne out by the record. Captain Feltman stated: "He did all the talking. I didn't have to ask too many questions." [11a] It is clear that this personality condition was a superseding cause of the confession and adequately insulated it from any taint resulting from the arrest.[12]

There is another critical factor which serves to insulate Gockley's statements from his arrest. Petitioner was arrested at 6:00 p. m. on November 17th. The next day, he voluntarily surrendered the keys for his residence to the police so they could search the premises. This search was held to be consensual by Judge Luongo in his first decision in this case, and that holding was affirmed by this Court. 378 F.2d at 399–400. Following that search, Gockley was confronted with a wallet containing Mrs. Klein's identification papers and other documents. The questioning on the 19th of November which led to the statements in issue was based on information discovered during the lawful inspection of Gockley's residence. And the statement of the 19th was clearly the product of that search, not the arrest. Since the search of November 18th was not a fruit of the arrest, it is difficult to say that the statement which followed the search was.[13]

---

ness of the confessions." 411 F.2d at 219. The question whether the statements were inadmissible for any reason was not raised until the close of the December 29, 1969, hearing. Nevertheless, the judge agreed to hear evidence and decide the issue, if appropriate, in order to avoid further fragmentation of the proceedings.

10. In *Wong Sun, supra*, the proscribed statements were taken immediately following Toy's illegal arrest, in his bedroom where he had taken refuge with his wife and son from the pursuing officers. In *Craig*, five days had elapsed between the arrest and confession, Craig had seen an alderman in the interim and had been warned of his rights, and he had been advised to keep silent by his attorney.

11. The district court made clear findings regarding the voluntary nature of the statements, which findings are discussed *supra* at page 241.

11a. The district court found that the duration of the periods of interrogation was a result of Gockley's verbosity.

12. The mere fact that a suspect confesses because he was suffering from a mental defect will not vitiate his confession if the police did not knowingly exploit that defect. United States ex rel. Rivers v. Myers, 384 F.2d 737 (3rd Cir. 1967).

13. Because the second statement was prompted by questioning with regard to discrepancies in the first, and because it was taken many days later, it too is insulated from any taint flowing from the arrest. Likewise, Gockley's trial testimony is isolated from any prior illegality. According to his trial counsel, Gockley insisted that he could make a good impression on the jury and could convince them of his innocence.

The cases cited by petitioner do not compel the conclusion that the statements were inadmissible as the product of an illegal arrest. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed. 2d 676 (1969), which adopted Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958), held that fingerprints were not exempted from the protection of the fourth amendment and that if the prints were obtained as a result of an illegal arrest or detention, then they were inadmissible under the exclusionary rule. The Court, however, did not hold that fingerprints were not admissible if there were a sufficient lapse of time after the improper arrest and if there were some other attenuation present. Furthermore, it would be difficult for the prosecution to demonstrate, because of the nature of the process of fingerprinting, that prints obtained during an illegal detention were free of taint because of intervening circumstances. Confessions, on the other hand, involve the active participation of the confessor, and are susceptible to the influence of circumstances which would free them of taint. Gockley's predisposition to talk and the consensual search are attenuating factors not present in either *Davis* or *Bynum*.[14] It is significant that in Davis, the Supreme Court pointed out that if fingerprints not connected with the illegal arrest were utilized at the retrial, a conviction could be sustained, 394 U.S. at 726, n. 4, 89 S.Ct. 1394. This is what occurred in *Bynum. See* Bynum v. United States, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960). I disagree with the majority's reading of *Davis* and *Bynum*, and do not believe there is justification for enlarging the interpretation of *Wong Sun* beyond the parameters set forth by the Supreme Court.

The majority also relies on Collins v. Beto, 348 F.2d 823 (5th Cir. 1965); but the facts there are distinguishable from those here. In that case, coercion was found where the police arrested the petitioner without a warrant or probable cause, questioned him, and forced him to submit to a polygraph test. About a month later, Collins was re-arrested without a warrant, and concededly without probable cause. He was secreted at Texas Ranger Headquarters, and unjustifiably incarcerated under a false name for vagrancy, all for the purpose of denying him access to friends, relatives and legal counsel. Before confessing, Collins was questioned late at night, and was not told of his right to consult wth a lawyer or his family. Rather than attenuation, *Collins* is illustrative of a continued practice of illegality.

The proper test applicable to the facts of this case is set forth in *Wong Sun:* "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. * * *" 371 U.S. at 488, 83 S.Ct. at 417. The majority here can only hypothesize that the statements in issue have "been come at by exploitation" of the arrest and detention, and that the arrest and detention were motivated by the "purpose of controlled, persistent and repeated questioning," although the district court made no such finding of fact. However, the legal search of November 18th and the fact that the district court found that "Gockley willingly engaged in a battle of wits with the police, and * * * gave them information, some true, some false, in an attempt to outsmart them," 314 F.Supp. at 846, are

14. In *Davis*, the police, who were looking for a young Negro male, first detained, fingerprinted, and released the petitioner along with many other similar youths; then arrested the petitioner without a warrant or probable cause, drove him over 90 miles to the state capitol, jailed him overnight, and extracted a statement; thereafter, defendant was returned to Meridian, jailed, and fingerprinted again.

*Bynum* presents a similar factual situation. The defendant had been told to come to a police station if he wanted to inquire about his arrested brother. Upon arrival, he was arrested without a warrant or probable cause and immediately fingerprinted.

two elements leading to the confessions "sufficiently distinguishable [from any illegality] as to be purged of the primary taint." Accordingly, even if the arrest were considered illegal, in light of the principles of attenuation enunciated in *Wong Sun,* the petitioner has failed to demonstrate that the district court erred in finding that the confessions were admissible.

### III

Another major contention by petitioner is that the statements used against him were coerced.[14a] In support of this thesis, he cites six factors: "lack of appropriate warnings," "lack of a prompt judicial hearing," "undeviating intent of the police to extract a confession," "incommunicado interrogation," "[his own] mental condition," and the pre-arrest interrogations. Petitioner states that the district court erred in analyzing these points individually and asserts that "all relevant factors must be considered and weighed together. Culombe v. Connecticut, 367 U.S. 568, 601 [81 S.Ct. 1860, 6 L.Ed.2d 1037] (1961), *see* Lynum [Lynumn] v. Illinois, 372 U.S. 528 [83 S.Ct. 917, 9 L.Ed.2d 922] (1963)." It is apparent from reading the district court's opinion, however, that all of the relevant factors [15] were weighed together by the

judge. There is substantial evidence to support his findings of fact regarding the elements, and on the basis of those findings, his conclusion that the statements were voluntary, and not coerced, is reasonable.

The most significant and unassailable underlying finding by the district judge in this regard is that "the testimony of the police officers is more credible. Gockley did not impress me as truthful and I simply do not believe his testimony." 314 F.Supp. at 845. Unless this crucial finding is clearly erroneous, all the other findings bearing on the issue of coercion are fully supported by the testimony of Captain Feltman and the others.

Petitioner first claims that his statements were coerced because he was not given appropriate warnings. However, Captain Feltman testified, and the district court found, that Gockley was advised of the charges against him and his right to use a telephone. Feltman and Krause also stated that Gockley had been warned of his rights prior to the transcription of his statements.[16] Furthermore, Gockley did not ask for legal counsel either at the time of his arrest or at the time of the transcription of the first statement.[17] These determinations that

---

14a. Although the view taken by the majority makes it unnecessary for them to discuss this point, it is incumbent on me to consider it because of my conclusions that the arrest was legal and that, in any event, the statements were attenuated from the arrest:

15. In Culombe v. Connecticut, 367 U.S. 568, 603–604, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), the Supreme Court described the process of determining whether a confession was voluntary. The first phase involves finding the "crude historical facts" while the others involve finding and applying "psychological fact." Both historical and psychological facts are relevant factors surrounding the confession. But merely because the petitioner alleges that factors exist does not make it so. The allegations must first be considered individually to determine if they are supportable by fact. If it is determined that one or more allegations are untrue, then the facts alleged are not factors surrounding the rendition of the statements and do not have to be considered further. On the other hand, all of the allegations found to be wholly or partially factual must then be weighed together to determine the issue of voluntariness.

16. Although the warnings given to Gockley were inadequate by present-day standards, his arrest and interrogation occurred several years before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) were decided, and these cases are not retroactive. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

17. Gockley did request counsel when Krause attempted to administer a lie-detector test in early December. Because he was not authorized to grant the request, Krause then refrained from continuing with that form of interrogation.

Gockley was advised and given the right to telephone are not clearly erroneous since they are supported by credible testimony produced at the habeas hearing and at the original trial. Further, Judge Luongo specifically found that the strongest possible warnings would not have induced Gockley to remain silent.

The second point by petitioner is that the lack of a prompt judicial hearing in effect makes his statements coerced. The district judge considered the evidence as to the result of this lapse, and could not conclude that the delay affected Gockley's statements. Petitioner knew he had been arrested on a forgery charge, and was also aware of his right to counsel, his right to remain silent, and his right of access to a telephone. Thus, the evil which a prompt judicial hearing is designed to prevent simply were not present in this case.

Petitioner next asserts that the police exhibited "an undeviating intent to extract a confession" from him. This contention is based primarily on the length of Gockley's detention from November 17 to December 9, and on the transfer of Gockley from one jail to another for the purpose of questioning. However, the record and findings of the district court are clear that the length of the interrogation sessions resulted from "Gockley's verbosity and propensity for fabrication." 314 F.Supp. at 845. There has been no suggestion that Gockley was treated poorly or denied food, water, or sleep. The continued detention after November 20, was not motivated by an intent to elicit further statements, but rather was required because the police by then had charged Gockley with the murder of Clement Smith. And the statement of December 9 was given in response to police questions as to facts alleged in the earlier statement which could not be verified. At no time did the police use trickery or deception to attempt to induce Gockley to confess, as was the case in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), relied on heavily by petitioner.

Petitioner's fourth alleged coercive factor is that Gockley was interrogated while being held incommunicado. This assertion, however, is flatly contradicted by the record. The trial judge found that petitioner could have availed himself at any time of the opportunity to communicate with others but that he did not do so because of "his family's antipathy to him and * * * his apparent lack of friends," and that he "chose to attempt to outwit the police without the aid of counsel" 314 F.Supp. at 846.[17a]

As a fifth factor petitioner urges that his mental condition was an element which compels the conclusion of coercion. However, there is no indication that the police were aware of his condition, and therefore, they may not be charged with having exploited it. United States ex rel. Rivers v. Meyers, 384 F.2d 737 (3rd Cir. 1967). What the police did know was that Gockley was intelligent, literate, and articulate; a high school graduate who had had prior experience with the criminal process. To the police, Gockley seemed to be cooperative, and they saw no reason not to avail themselves of the information freely offered. Furthermore, the state-appointed Sanity Commission found that Gockley was not a mental defective, that he was not mentally ill,[18] and that he would be able to un-

---

17a. In an earlier opinion by this Court, it was stated that "[t]he accused was held incommunicado." 378 F.2d at 400. Since the Rules provide that findings of fact be made by the trial court, and that such findings may not be set aside unless clearly erroneous, this reference may not be considered a finding of fact. After further hearings, at which the facts were fully developed, the district court did find as a fact that Gockley was *not* held incommunicado. Because there is credible evidence in the record to support such finding, we may not characterize it as clearly erroneous.

18. The Commission utilized the following definition of mental illness: "[A]n illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care."

derstand his position, cooperate with counsel, and make a rational defense. It based these conclusions on a private, unrecorded examination of petitioner,[19] as well as on the testimony of his brother.

The last coercive factor asserted by Gockley is the history of surveillance and interrogations prior to his formal arrest on November 17. However, the evidence clearly shows that the surveillance, although characterized as "constant" and "day and night," was in fact neither.

This surveillance consisted merely of several trips to Gockley's residence, made with the hope he would be there, in order to obtain Mabel Klein's power of attorney and contract. During the investigatory period, the police were attempting to ascertain the facts surrounding the disappearance of Mabel Klein, and Gockley clearly figured in that inquiry. That he was seen at her house on several occasions was not a product of a surveillance of Gockley, but rather was a product of concern over Mabel Klein, herself. Similarly, the few actual meetings between Gockley and the police were separated by a span of at least a month, and one meeting resulted from mere chance. According to the district court findings, it was subsequent to the meeting where Gockley told the police to look for Clement Smith and after that lead boomeranged and shifted the full focus of the investigation to Gockley,

that the police had probable cause for arrest. Even so, on October 31, when they met Gockley and asked him for the documents, the encounter was brief and not the least oppressive. The prearrest conduct by the police fell far short of any brooding omnipresence which might overbear petitioner's will and cause his statements to be coerced.

Finally, petitioner urges that the combined factors show coercion, and that this case comes squarely within Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949), and Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). A reading of these cases indicates clearly that the district judge was correct when he said that "[n]either the physical nor the psychological pressures evidenced in *Turner* and *Clewis* are presented here." 314 F. Supp. 847.[20] In summary, when all the factors are considered, including the timing, number and type of warnings given by the police, the lack of a prompt judicial hearing, the intent of the police, the availability albeit non-utilization of means of communication, the pre-arrest history, and Gockley's mental condition, as well as his intelligence, prior experience with the police, willingness to cooperate, knowledge of his constitutional rights, the lack of intimidation and deception, and the exculpatory nature of the statements,[21] it appears manifest

19. According to the Commission the fact that its report was based on a private examination accounts for the difference between the report of the Commission and that of Dr. Bowers. The latter was based on an examination conducted in the presence of sheriff's deputies.

20. In *Clewis*, the petitioner had been held 38 hours before being taken to a magistrate to be charged, had had little sleep and very little food, and appeared to be ill. Contact with a lawyer had been withheld. He also alleged physical abuse. Between his first and second confessions, although formally charged, he was unrepresented and unadvised by counsel, frequently interrogated, driven on a 600 mile trip, administered polygraph tests, and given very little to eat. A third statement was elicited before warnings were

given or a lawyer was obtained. In *Turner*, the defendant was arrested on suspicion, held incommunicado for five days without arraignment, counsel, or advice as to his rights. During that period, he was interrogated day and night by relays of policemen until he confessed. The purpose of the delay in arraignment, extraction of the confession, was admitted by the Commonwealth.

21. Both statements were consistent as to the cause of Mabel Klein's death: that she died of natural causes in the presence of Clement Smith. They were also consistent with the theories that the first shot which was fired was the result of a scuffle with Smith and was either accidental or a matter of self-defense. Also, Gockley's testimony at trial, although it was at variance with regard to many

that the finding by the district judge that the statements were not coerced, but rather were the product of a voluntary attempt to outwit the police is sound and valid, and certainly not clearly erroneous. Therefore, I conclude on this issue, as on the others, that petitioner has failed to demonstrate he is entitled to have the writ issue.

## IV

One other matter merits comment. This and similar cases that come before us after state convictions raise grave questions whether federal habeas corpus is an appropriate vehicle for the vindication of fourth amendment rights such as at issue here. The problem presented is whether federal habeas corpus should be granted in cases not involving punishment for a constitutionally protected act; fundamental constitutional error casting doubt upon the ability of the trial court to perform its function of correctly finding the facts, plus an allegation of ultimate innocence by the petitioner; or some official misconduct so outrageous that continued incarceration is intolerable.

The question where fourth amendment violations could be properly raised, procedurally, was left open to the states in Mapp v. Ohio, 367 U.S. 643, 659, n. 9, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). However, several years later Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 770 (1963) and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963),

expanded the jurisdictional bases for federal habeas corpus so that federal courts were granted broader latitude to review state convictions. The explicit holding of Fay v. Noia, that the doctrine of failure to exhaust state remedies applied only to remedies available at the time of the petition, 372 U.S. at 434–438, appears to have eroded reliance on *Mapp* as authority that fourth amendment issues be raised according to state procedural rules.[22]

In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court considered the rule of *Mapp* and held that it would not be made retroactive because its deterrent purpose would not be served thereby, and because the fairness of Linkletter's trial was not at issue. 381 U.S. at 636–637, 639, 85 S.Ct. 1731. Despite the restraint manifested in that opinion, by 1969 there was no doubt that Supreme Court decisions extended federal habeas relief to state prisoners solely on the basis that such prisoners were alleging that unconstitutionally obtained evidence was admitted against them at trial. *See* Kaufman v. United States, 394 U.S. 217, 225, 89 S.Ct. 1068, 22 L.Ed. 2d 227 (1969).[23] However, it is now clear that the Supreme Court's prediction in footnote 9 of *Mapp*, that the fourth amendment exclusionary rule would apply only to a narrow class of cases, has not been validated by the passage of time. The federal courts are plagued with petitions from state prisoners who allege that an arrest or a search

---

details of both statements, was essentially exculpatory because it tended to affirm these two important allegations.

22. Justice Brennan stated that failure to comply with state procedural rules would not justify denial of federal habeas relief unless such failure amounted to an intelligent, understanding waiver of the rights in question. *Id.* at 399, 438–440. *But see* Gibbons, Waiver: The Quest for Functional Limitations on Habeas Corpus Jurisdiction, 2 Seton Hall L.Rev. 291 (1971). In this excellent article, Judge Gibbons criticizes the language of Fay v. Noia, analyzes the result intended

by the Supreme Court, and suggests a new approach to the problem. *See also,* Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 159–160 (1970).

23. *Kaufman* involved a federal prisoner whose conviction had been previously affirmed. He then sought relief under 28 U.S.C. § 2255, alleging that his conviction was based upon the improper admission of illegally seized evidence. The Supreme Court, reasoning from cases involving state prisoners, expanded the scope of section 2255 actions to encompass unlawful search and seizure claims asserted by way of collateral attack.

was illegal, and that their convictions were bottomed on such violation.[23a]

In the present case, the first branch of Gockley's argument is that he is entitled to relief because his arrest was invalid, and his incriminating statements were a product of that arrest. This proposition has nothing at all to do with the question whether petitioner received a trial before a court able to find the facts fairly and accurately. Rather, the implied premise upon which Gockley's request is based is that if we grant the petition, then the police will be deterred in the future from making illegal arrests, and the courts will not have sullied their integrity by permitting convictions based on violations of the law by police officers. However, the Reading police officers most closely associated with this case have retired, and the district attorney, who prosecuted the case, no longer holds that office. It is difficult to see who would be directly deterred if the writ is granted. Furthermore, if petitioner's constitutional rights were in fact violated, recourse to an action under the Civil Rights Act, 42 U.S.C. § 1983, would provide compensation and deterrence without affecting the state's legitimate interest in insuring that offenders be adequately punished.

That the ultimate aim of the decision by the majority—enhancement of the integrity of the judicial system—will be achieved if Gockley should be retried without the use of his statements is, at best, shrouded in doubt. There is also a question whether the district courts and even the courts of appeals should have the function of overseeing state courts in such manner, especially since the district courts and courts of appeals are parallel,

rather than superior, to the state courts. In view of the heavy case load oppressing the federal courts, where possible the states should police their own system subject to review by the Supreme Court, so that the federal judiciary may accomplish its primary mission to the extent its abilities and resources allow. Cases like the present one only sap the limited reserves of the federal courts, and if allowed to proliferate, will seriously enervate the federal judiciary as we know it.

I am not now questioning the rule of *Mapp* in cases of direct appeal or state post-conviction proceedings, but only whether claims of violations of that rule ordinarily should constitute grounds for relief from state convictions through federal habeas corpus.

A second major branch of Gockley's petition is that his conviction was based on statements coerced in violation of fifth amendment rights. There are two premises underlying this argument. First, that the statements, because they were involuntary, are inherently unreliable and that as a result the conviction based upon them was not an accurate finding of fact, thereby depriving Gockley of his right to a fair trial, *see generally,* Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Second, that coerced statements are so repugnant to our system of government convictions ought not be based upon them. *See* Culombe v. Connecticut, *supra.* However, this is not a case like Fay v. Noia, *supra,* where the statements were extracted by "satanic" means,[24] or where only one of three defendants remained in jail because his counsel failed to pursue certain procedural steps, taken by the other two defendants.[25] Regard-

---

23a. The soundness of the premise behind the rule of *Mapp,* deterrence, is now being seriously questioned. *See* Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Harlan, J., concurring; Black, J., concurring and dissenting; Burger, C. J., concurring in part and dissenting in part).

24. 372 U.S. at 396, n. 2, 83 S.Ct. 822, *quoting* United States ex rel. Caminito v. Murphy, 222 F.2d 698, 701 (2nd Cir. 1955). In *Caminito,* Noia's two co-defendants were ordered released.

25. 372 U.S. at 395, n. 1, 83 S.Ct. 822. History, as well as a close reading of the opinion, teaches us that at least some of the Justices forming the majority of the Supreme Court in Fay v. Noia were mo-

less of how the factual and legal issues presented here are resolved, unless Gockley is innocent his conviction can hardly be called an affront "to the conscience of a civilized society," which is the manner in which the Supreme Court described the petitioner's plight in Fay v. Noia, *supra*, 372 U.S. at 441, 83 S.Ct. at 850.[26] The actions of the Reading police, even if irregular or indeed illegal may not accurately be characterized as "satanic."

The concept of allowing a guilty person to remain in jail after his conviction is final because the procedure on direct appeal has been concluded is hardly novel or medieval. Justice Black has asserted that before he would allow a collateral attack to succeed he "would always require that the convicted defendant raise the kind of constitutional claim that casts some shadow of a doubt on his guilt." Kaufman v. United States, 394 U.S. 217, 242, 89 S.Ct. 1068, 1082, 22 L.Ed.2d 227 (1969) (dissenting opinion). He further stated that one of the "vital considerations" is the defendant's "guilt or innocence." *Id.* at 235, 89 S.Ct. 1068.[27] Judge Friendly has stated that innocence should not be irrelevant on collateral attack even though it may be on direct appeal; to the extent we have gone beyond this, the system needs revi-

sion to prevent abuse, a waste of the limited resources available for the criminal process, and public disrespect for the judgments of courts. Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 172 (1970).

I am not suggesting that the federal habeas petitioner must prove his innocence by a preponderance of the evidence in order to be entitled to relief, but only that he demonstrate that the constitutional violation resulted in error which makes questionable the factual accuracy of the guilty verdict. Coupled with this demonstration of uncertainty as to guilt, the petitioner should affirmatively assert that he is innocent, for if he is not innocent, society has a strong interest in his continued incarceration. More than a not guilty plea is required, because that plea does not necessarily mean that the pleader is asserting his innocence, but only that he is challenging the prosecution to prove its case beyond a reasonable doubt.

This seems consistent with Section 2243, which specifically provides that the court shall "dispose of the matter [i. e. the petition for habeas corpus] as law and justice require[s]." [28]

---

tivated by considerations other than the "satanic" means utilized to coerce the confession and Noia's subsequent inability to challenge his incarceration. The basic injustice in that case was that Noia, who did not appeal because of his fear of the death penalty, remained in jail while his co-defendants were eventually freed. And even though Noia protested his innocence throughout and the state had no evidence that he was guilty other than the coerced confession, there was no procedural avenue available to afford relief. "It was under these circumstances, strongly appealing to the Court's sense of what justice required, that this Court held that Noia was entitled to challenge his conviction even though it had previously become 'final.'" Kaufman v. United States, 394 U.S. 217, 235, 89 S.Ct. 1068, 1078, 22 L.Ed.2d 227 (1969) (Black, J., dissenting).

26. Gockley has never denied killing Clement Smith. His apparent defense at trial

was that the killing was either accidental or justifiable.

27. Justice Black raised this matter, as well as the issue of the overall scope of federal habeas corpus, again in Whiteley v. Warden of Wyoming State Penitentiary, 401 U.S. 560, 570, 574–575, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (dissenting opinion). Although Mr. Justice Blackmun agreed with much of Justice Black's opinion, the majority opinion did not deal with either matter.

28. Another aspect of the problem of collateral attack in a criminal connection is addressed by Justice Harlan in United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), when he considered whether the *Marchetti-Grosso* rule should be retroactive. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.

In this case, it cannot be said the Gockley's conduct in shooting Clement Smith was constitutionally protected. Nor can it be said that the grant of the writ will ensure that his retrial would provide a more accurate fact-finding process. And, quite apart from Gockley's failure to assert his innocence, there is sufficient evidence to preclude anyone from contending that Gockley had not committed the act for which he was punished.

Although Justice Harlan and Justice Stewart, both of whom dissented in Fay v. Noia, did not concur with Justice Black in *Kaufman* as to the importance of innocence, nevertheless they do contend that the scope of habeas corpus re-examination of convictions should be narrowed. Kaufman v. United States, *supra*, 394 U.S. at 242–243, 89 S.Ct. 1068 (Harlan & Stewart, JJ., dissenting). In his concurring and dissenting opinion in Mackey v. United States, 401 U.S. 667, 692–693, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971), Justice Harlan asserted that the writ of habeas corpus ought issue only on substantive due process grounds, *citing* United States v. United States Coin & Currency, 401 U.S. at 722, 91 S. Ct. 1041 (1971), or on procedural grounds which meet the test of Palko v. Connec-

ticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937).[29] He explained that when there occurs nonobservance of those procedures "implicit in the concept of ordered liberty," or where "time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, * * * alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction," habeas corpus is an appropriate remedy. But I respectfully suggest that such standards are not satisfied unless the petitioner asserts his innocence and demonstrates that the police procedures have decreased the reliability of the fact-finding process. Application of the criteria suggested by Justice Harlan to the facts of this case fails to show that the procedures employed either vitiated the fairness of Gockley's conviction or offended principles "implicit in the concept of ordered liberty."

It is significant here that Gockley has not asserted his innocence in either his petition or brief before this Court. Since the evidence of his guilt is substantial, it would seem preferable to save judicial time and energy to consider the case of one who contends he is innocent

---

Ed.2d 906 (1968) held that where one statute requires the report of an act which another statute makes criminal, the fifth amendment privilege against self-incrimination may be interposed as a defense to a prosecution for failure to comply with the reporting requirement. Justice Harlan concluded that the retroactivity cases fall into two classes: those which hold prior decisions non-retroactive because they were "concerned with the implementation of a procedural rule which *does not undermine the basic accuracy of the factfinding process at trial*," and those which require retroactivity "because the failure to employ such rules at trial meant there was a significant chance that innocent men had been wrongfully punished in the past." In *Coin & Currency*, this classification was not useful because the majority granted retroactivity on the rationale that the conduct for which punishment was sought was constitutionally protected. The classification referred to by Justice Harlan has utility in determining whether collateral attack should be

permitted, for the competing interests are similar in both retroactivity and habeas corpus cases. Those interests may be summarized as finality on one hand, *see* Mackey v. United States, 401 U.S. 667, 675, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring and dissenting opinion), and the correction of constitutional error on the other. *See* Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969) ; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). The need for finality has been eloquently expressed many times, and it is not necessary to reiterate those arguments.

29. *Palko* held that a state could appeal a conviction of second degree murder, retry the defendant, and sentence him to death for first degree murder because this kind of double jeopardy was not such that it violated the fundamental principles which underlay our civil and political institutions. 302 U.S. at 328, 58 S.Ct. 149.

or whose conviction is based upon methods which cast doubt on the validity of the facts as found or which affront the conscience of civilized society.

I do not suggest that the vast majority of prisoners who would be unable to qualify for relief under the tests set forth herein should be without remedy. I assert only that this remedy should lie elsewhere than within the province of a collateral attack in the federal courts. Perhaps the proper party to implement the post-conviction correction of errors similar to those at issue here is the governor of the applicable state, or an agency fulfilling a similar position. *See,* Fay v. Noia, *supra,* 372 U.S. at 476, 83 S.Ct. 822 (Harlan, J. dissenting). In particular, an enlightened state pardons board, which would screen petitions and recommend clemency in deserving cases, would provide a viable alternative avenue of relief, and would greatly aid in stemming the flood of federal habeas corpus petitions. The responsibility of the state in the administration of criminal justice extends further than the function of prosecution, and the federal judiciary should not become encumbered by the state's abdication of these other functions.

The crux of the matter is that as the scope of the federal habeas corpus remedy has been ever expanding, the need for it has been continually contracting. Today, nearly every criminal defendant other than the traffic violator is represented by counsel.[30] The Supreme Court, over the years, has appropriately enlarged and protected the rights of the accused at every important stage in the criminal process.[31] In short, the accused citizen is afforded a full panoply of procedures, including the right to suppress probative but illegally obtained evidence and the opportunity for extensive discovery, regardless of his stature in the community. Furthermore, the accused, if convicted, can argue for vindication throughout the appellate process, all the way to the Supreme Court of the United States. Following the exhaustion of direct appellate remedies, the convicted defendant may begin the process anew by seeking relief under the appropriate state post-conviction hearing act.[32] It seems unreasonable, and perhaps destructive of long range judicial values, that the process should be repeated again and again in the federal courts absent some showing that the habeas petitioner has been convicted either for a constitutionally protected act, because of some procedural defect which casts doubt on his guilt, or by violence to our minimum standards of fair treatment.

## V

For all the foregoing reasons, I would affirm the district court and deny the petition for habeas corpus.

30. Fay v. Noia was decided in 1963, the same year that the Supreme Court required counsel be appointed for all persons charged with felonies. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Noia had been convicted some 20 years earlier, where counsel was not appointed except in capital cases, and then only for the trial stage of the proceedings.

31. *See e. g.,* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (lineup); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (custodial interrogation); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (custodial interrogation); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (counsel on appeal); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (transcript for appeal).

32. It was the denial of this opportunity because of Noia's failure to appeal which in part shaped the decision in Fay v. Noia. *See* 372 U.S. at 426–434, 83 S.Ct. 822.